STEPHEN W. DOSS AND STEWART NEWELL, APPELLANTS, v. WILLIAM TYACK AND LINDLEY MURRAY.

A court has a right to set aside its own judgment or decree, dismissing a bill in chancery, at the same term in which the judgment or decree was rendered, on discovering its own error in the law, or that the consent of the complainants to such dismissal was obtained by fraud.

Doss et al. v. Tyack et al.

A verdict on an issue to try whether a sale was fraudulent, finding the same to be fraudulent, will not be set aside on a certificate or affidavit of some of the jurors, afterwards made, as to what they meant.

A Chancellor does not need a verdict to inform his conscience, when the answer denies fraud in the abstract, whilst it admits all the facts and circumstances necessary to constitute it, in the concrete.

THIS was an appeal from the District Court of the United States for the State of Texas.

A statement of the facts is contained in the opinion of the court.

It was argued by *Mr. Allen* and *Mr. O. F. Johnson*, with whom was *Mr. Hale*, for the appellant, and *Mr. Sherwood*, for the appellee.

The points, raised by the counsel for the appellant, were the following:

I. The complainants having utterly failed to make out their case, by proving the material allegations and charges contained in the original and amended bills of complaint, the defendants were entitled to a decree of dismissal.

II. The property of the copartnership confided to Newell, and especially the goods sold to Edgar, were not misapplied, but disposed of in conformity with the intendment of the copartnership agreement. By this it is manifest that the partnership was not intended as a pure mercantile establishment, but one for the transaction of a " commission, general, and auction business." Part. Agree't. Art. 1, P. R. 2; of a business " new and experimental in its nature"— Id. Art. 9; a business connected with the operations of the " Galveston Company," which Newell, by more than two years' labor and great expense, had " paved the way for;" and which the fifth article of the said agreement refers to (there being nothing else in the case to which it could by possibility refer,) in express terms, viz.: that, in consideration of " the expense and labor heretofore incurred by Stewart Newell, in paving the way for the contemplated business, he shall be entitled to one quarter of the net profits, before division."

III. The creditors, in their instructions, refer to " agreements and understandings " of Newell, with his partners and themselves; thereby, admitting themselves to be privy to the said partnership agreement, and that they gave credit to the copartners, in the business thereby contemplated. The case contains no proof of any other agreement or understanding, to which they could pretend to refer.

IV. The creditors obtained, by a species of moral coercion, which their position enabled them to use, the primary concur-

rence of Tyack & Murray with themselves, in the appointment of William E. Warren as their mutual agent, and in their instructions, which Tyack approved, prescribing the management to be used by Warren, in his interviews with Newell, and in conducting the business confided to him, after his arrival in Texas. The suit was manifestly the result of a conspiracy between the creditors and complainants; the object being to obtain a dissolution of the partnership, a distribution of the assets in Newell's hands, or to cause him "to place the merchandise in the hands" of Warren, "as trustee for the creditors, or Captain Tyack;" the creditors, on their part, agreeing not to proceed against the firm of "William Tyack & Co.," in New York, for the space of sixty days; and, that the interests of Tyack should be protected, and his instructions, touching the suit against Newell, strictly followed.

V. The purchase of the goods by Doss, was for a valuable and adequate consideration, without notice of any intended fraud, on the part of Newell, made for the benefit of all the partners, and within the scope of the "new, experimental, and general" business, described in the partnership agreement. The verdict does not find the purchaser guilty of any fraud, and the jurors depose that they did not intend to charge him with fraud. It declares the "sale," but not the purchase, fraudulent as to the complainants. Anderson & Wilkins v. Tompkins et al. 1 Brock. 456. This finding did not authorize the annulling of the sale.

VI. Referring to the direction of the creditors, requiring their agent to be governed by the instructions of Captain Tyack, the several letters of Tyack & Murray to Newell, advising and urging him to sell the goods; their subsequent approval of the sale, after ample time to judge, and referring to their confederacy against Newell, before mentioned; the sale was authorized before, sanctioned at the time, and confirmed, after it was consummated, in the most deliberate manner by both the complainants and the creditors.

VII. All matters of complaint, embraced in the bill in this cause, excepting the said sale, were included and adjudicated in the suit of these complainants against Newell, commenced and tried in the State Court. The judgment decides the merits of the cause, is conclusive of all the said matters, and remains in full force. It directed a restoration of the goods to Newell — they having been taken out of his hands by process in the cause. After such restoration, the said goods were sold to Doss, and this judgment was a full authority for him to purchase them.

VIII. The price paid by Doss for the goods, was near $2,000

more than their value as estimated by the complainants, and near $4,000 more than that estimated by the witnesses. It consisted of $4,000 equivalent to cash advanced, and the remainder in lands, amounting to 6,485 acres, and worth much more than $7,753, as testified by the witnesses. One of the tracts, containing 177 acres, is estimated by Mr. Thompson, a witness well qualified to judge, as worth $30 per acre. Newell, in the exercise of a sound discretion, arising from his business connections with the complainants, and expressly devolved upon him by their advice and directions, and acting in conformity with the professed desire of the creditors contained in this 5th instruction, declaring that they wished " no wanton sacrifice of property for the immediate payment of the whole or a portion of their claims," could not have made a sale of the goods more beneficial to all the parties interested, than the one negotiated with Mr. Doss.

IX. It is respectfully insisted, that the issue directed by the court " to determine whether the sale of the goods was or was not fraudulent as to the complainants," was defective and immaterial, and, for this cause, improperly granted.

The verdict must conform to, and correspond with, the issue — that is, find its affirmative or negative, and nothing else. If the jury find the former, viz., that the sale was fraudulent as to the complainants, it would be incompetent for them, under this issue, to go further, and determine also which of the defendants perpetrated the fraud, or whether they combined together, and were jointly chargeable. Such a finding could not authorize a decree setting aside the sale, nor in any way properly influence the conscience of the court. Such a decree would have to rest on proof in the cause, *dehors* the verdict, that the purchaser was a party to the fraud ; and whether such proof existed or not, the verdict could be of no possible service or utility to the court.

Hence the court will reverse or disregard the order directing the issue, and determine itself the character of the sale. Nichol *v.* Vaughan, 2 Dow & Clark, 420 ; Townsend *v.* Graves, 3 Paige, 457 ; Belknap *v.* Trimble, 3 Paige, 601 ; Gardiner *v.* Gardiner, 22 Wendell, 526.

X. The verdict, viz., " In this case, we, the jury, find the sale fraudulent," does not determine or satisfy the issue, and is for this cause void. It does not find as to whom the sale was fraudulent, and may as reasonably be construed to apply to the creditors or to one of the defendants as to the complainants.

XI. If the verdict could be so interpreted as to charge either or both of the defendants with fraud against the complainants, which we deem impossible, it would be contrary to the entire body of evidence adduced at the trial, and is void at law.

XII. No effect can be given to the verdict prejudicial to the interests of Mr. Doss, without disregarding or inverting what the jury solemnly intended its effect to be, as appears by their affidavit. An application and construction of a verdict, opposed to the intention and moral sense of the jurors who found it, cannot quiet the conscience of a court of equity.

XIII. The issue, as tried, does not answer the purpose for which it was intended. Indeed, it was so framed that the verdict throws no light upon the question for the determination of which it was directed. The whole matter is before the court with sufficient precision, and all the proofs to enable it to come to a decision, without another reference to a jury. The court, under these circumstances, will decide the matter at once, unless in its discretion some new issue or issues be deemed expedient in order to attain substantial justice. Armstrong v. Armstrong, 3 M. & K. 45; Blackbourn v. Gregson, 1 Bro. C. C. 423, 424; Dan. Chan. 1316.

XIV. The court below erred in setting aside the decree of the 3d of August, 1849, dismissing the cause. The decree was made by consent, and is not subject to appeal or review. Webb v. Webb, 3 Swanst. Ch. R. 658; French v. Shotwell, 5 Johns. Ch. 564; Atkinson v. Manks, 1 Cowen, 691; Kane v. Whittick, 8 Wend. 219.

1. Notwithstanding the position taken by counsel, viz., that the powers of attorney, by the complainants and creditors appointing William E. Warren their mutual agent, the agreement and expenditures of money by the creditors in the prosecution of the cause, were sufficient to prevent the complainants, without the assent of the creditors, from dismissing the bill; and whether the suit be treated as a creditor's suit or not, under the authority of Williamson v. Wilson, 1 Bland, 418; still the complainants, until the final decree, retained absolute dominion over the suit, and might dismiss the bill at pleasure. Handford v. Story, 2 Sim. & Stu. 196.

2. The complainants, by their several powers of attorney, revocations, and other instruments under seal, emphatically required and obtained the dismissal of said cause, through solicitors specially employed and instructed for that purpose, and for reasons fully declared. The decree of dismissal was a mere execution of those powers. At the moment of its rendition it became a vested right of the defendants, granted and confirmed by the respective deeds of the complainants. A power executed by decree is no more revocable than one executed by grant or conveyance of land.

3. The decree was opened upon motion, founded on the application of Murray alone — it was error to open it as to Tyack.

The order could not properly vacate the decree generally; besides, it was a regular decree on the merits, and could not be set aside by a motion. Radley *v.* Shaver, 1 Johns. Ch. 200.

4. Murray, excepting by his petitions, does not attempt to revoke his prior deeds. This is no revocation. He prays the court to restore the suit, and to declare those deeds null and void, alleging that the same were obtained by fraud practised by Newell and others.

We respectfully insist that the court could not, so long as those deeds remained in force as executed powers, vacate the decree of dismissal or restore the suit; and that the deeds themselves, and the manner in which they were obtained or executed, could not be inquired into or pronounced void by the court, except by regular suit against the parties charged, whereby the alleged frauds could be put in issue, and the whole matter fairly tried.

The petitions of Murray and Tyack, and the supposed revocation of the latter, filed on the 7th of January, 1850, cannot obviate any objections to the said order of the previous term vacating the decree of dismissal.

6. The affidavits of Messrs. McGreal and Andrews, filed by the defendants in opposition to the said petitions of Murray, contradict all the essential statements therein contained, and effectually impeach their veracity, showing them untrue and not entitled to credit.

XV. The effect of the solemn admissions and declarations, deliberately made by both of the complainants in their several letters and instruments under seal, before referred to as evidence in favor of the defendants, is not affected or weakened by the last-mentioned petitions of the same parties contradicting and garbling these said admissions and declarations.

1. Because their said admissions and statements were opposed to their interests as complainants; whereas the contents of their said petitions tend to aid their recovery in this cause, and are justly liable to the suspicion of having been manufactured in order to accomplish their own purposes.

2. Because they are disingenuous and prevaricating in their character, and were manifestly made under influence which they, in their former statement, pronounced compulsory, coercive, and such as they were unable to resist.

3. Because they are not entitled, in law, to any weight or credit, as evidence for the complainants, who are estopped from denying or averring any thing in contradiction to what they had before solemnly and deliberately acknowledged. Sprigg *v.* Bank of Mount Pleasant, 10 Peters, 257; Lajoye *v.* Priman, 3 Miss. 529.

XVI. By the master's report, $4,473.62 were allowed Tyack on account of capital paid in by him; whereas the amount he advanced did not exceed $2,200. Nothing was allowed Newell on account of the $7,000 standing to his credit on the books of William Tyack & Co. The report further finds him indebted to the firm on account of partnership property received and not accounted for by him. Exceptions filed by him for these causes were overruled, and in this and in the final decree in this behalf there are, as we conceive, error and injustice.

XVII. The master ought to have reported fully and correctly, the proof on which the several items contained in it are found, and the claims of the alleged creditors ascertained and allowed, as suggested in the exceptions taken by Mr. Doss. The items making up the amount found against Newell cannot be gathered from the report. There can be no doubt, however, although it does not definitely appear that Newell was charged with the $2,000 he paid in goods to Edgar under the authority of the complainants, and in due course of the partnership business. These errors affect the final decree, and render it fatally erroneous and unjust. Williamson v. Wilson, 1 Bland, 418.

XVIII. The bill contains no prayer for ascertaining the names of the creditors or the amounts due them severally. It prays merely that the receiver be directed by the final decree to apply the property to the payment of the said copartnership debts. This is deemed an insufficient basis for the specific provisions in favor of the alleged creditors embraced in the decree.

XIX. The decree annuls the sale made to Stephen W. Doss, as fraudulent against the complainants. But the restoration of the money and property paid by him for the goods, as sought by his motion, (P. R. 324,) is wholly denied. The copartners, by virtue of the decree, not only keep the goods they sold to Doss, but keep also the price or consideration they received for them, amounting to eleven thousand seven hundred and fifty-three dollars, ($11,753,) without the possibility of his obtaining the slightest compensation or reimbursement at their hands, if the decree be affirmed.

Relying upon the points suggested, the appellants respectfully ask for a reversal of the decree and a dismissal of the cause; or, instead of an absolute dismissal, that the cause may be restored to the same condition that it was placed in by the procuration of the complainants themselves, under the decree of the 3d of August, 1849, dismissing the same. If this be done, the appellees cannot be prejudiced, since they would retain the right to bring suit by original bill, as they might at first, to vacate their powers of attorney, and the decree obtained in execution

of them, on account of the pretended mistakes and frauds averred in their petitions subsequently filed, in order to attain their object in a too summary manner.

The counsel for the appellee made the following points:

1. So far as the question of fraud is concerned, the answers of both defendants, and the depositions used on the trial, are replete with the evidence of it. After putting forth the matters stated and admitted in the defendants' answers, and the exhibits made a part of them, no proof would have availed them, on the hearing, to escape the conclusion of fraud. The bad complexion of the whole transactions between Newell and Doss's agent, McGreal, is only equalled by the recklessness with which they attempted to take the property of the firm, divert it from its proper direction, and to place the proceeds of it beyond the reach of the copartners and creditors. The property, as copartnership property, was in the nature of trust property, and the principles declared in the case of Wormley v. Wormley, (8 Wheat. 422,) apply fully to this case.

2. The contracts between Newell and McGreal were individual contracts. It was incompetent for them to vary them, as evidence, or their complexion by parol proof, or their sworn answers. They were estopped from setting up the pretence, that they fairly intended to create a *bonâ fide* trust in favor of complainants. The complainants might have brought the aspect of a trust over the property to be conveyed by McGreal, had they elected to take the lands agreed to be sold by McGreal to Newell. The character of the transactions, however, between Newell and McGreal, must be evidenced by the contracts they made. The same rule would hold in reference to the absolute assignment to Franklin, and the draft in favor of Knight. Under the circumstances, they will bear no other construction than intention, on the part of Newell and McGreal, to place the copartnership property beyond the reach of complainants and the creditors.

3. So far as Newell was concerned, the payment of his individual debt, of $1,400, to Edgar, out of the store of Stewart, Newell, & Co., and his offering to mortgage the whole of the goods to Edgar, as security for his individual indebtedness, would have been sufficient cause for dissolving the copartnership.

4. Should the question be raised, whether his Honor, the District Judge, erred in setting aside the decree dismissing the bill, and in reinstating the cause, it may be replied, that the court below had power over the decree at any time during the term at which it was entered. The order, entered on the suggestion

of complainants, on motion, was a mere voluntary dismissal of the suit, under a delusion created by defendants, without trial on its merits, and without the effect of prejudicial laches. It was not in its nature *res adjudicata*, or final, as to the rights of the parties. No enrolment had taken place, nor had the minutes of the court been signed by the Judge, at the time he vacated the order of dismissal.

5. No decree can be regarded in its effect as final, that has been obtained by fraud, practised by one of the litigating parties on the other. Fraud will vitiate the judgment or decree of any court; and the court will set it aside, and allow a party to come in at any time, where the subject-matter has not passed beyond the reach or control of the court. The proper way of applying to the court is by motion, where the order sought to be vacated has been obtained on motion.

6. It was entirely evident, in this case, at the time of the order dismissing the bill, that the complainants had been imposed upon, or that they were in collusion with the defendants. In either case, it was proper for the court to vacate its order, and reinstate the cause the moment the complainants requested it.

7. Should it be urged, that the complainants and defendants were in collusion on the application to dismiss the bill, it may be answered, that it matters not as to the extent of collusion or degree of turpitude, between parties *in pari delictu*, where one comes in and asks the court to take jurisdiction for the protection of creditors or innocent persons. In such case, it has been well said, " The fraudulent party is not entitled to a standing in court on his own account, but to subserve the purposes of justice towards those he has attempted to injure."

8. The best reason, perhaps, for setting aside the decree dismissing the bill is, that the Judge erred in listening to the application and granting the order to dismiss it. At the time of the application it had been fully shown by the bill, answers, affidavits, and depositions taken, what the character of the transactions were between Newell and McGreal. In addition to this, the complainants had asked, in the bill, that the property of the firm might be given to the creditors. They had asked for the appointment of a receiver, and prayed that the property might be delivered over to him. They had executed an assignment on their part to the receiver, that he might the better collect the assets. The creditors had paid a consideration for the protection of their interest through this suit. It was too late, therefore, for the complainants to recall what they had done. Hunt *v.* Rousmanier's Administrators, 5 Cond. Rep. 401.

9. What the complainants had done was equivalent to the execution of a power of attorney, coupled with an interest;

26*

and had all the effect of a contract or deed, with a trust ingrafted on the instrument. It was not revocable even by the death of the party. The trust had been created; the trust-fund had been placed in the hands of the receiver under the order of the court; and no imposition on the complainants, nor collusion on their part, should have been permitted by the court to work a *devastavit* on the property placed in the custody of the court for the benefit of the creditors. The doctrine implied in the language of the court, in the case of Williamson *v.* Wilson, (1 Bland. 418,) well applies to this case.

In aid of this would also come the rule, " That a naked license is not revocable where it has been once acted on, or where an encouragement to spend money has been given, and the expenditure has taken place."

Even in an action at law, where one man says to another, " Bring the suit in my name; let the property recovered be applied to the discharge of my indebtedness to you," has always been held to operate as an equitable assignment, not revocable. Canfield *v.* Munger, 12 Johns. Rep. 346. The creditor has also, in such case, the right to continue the name of the assignor as a party to the suit, notwithstanding the nominal plaintiff should attempt to countermand the license.

10. In general, persons not parties to a suit in equity, cannot come in and ask for relief or protection. There are exceptions, however, to this rule. Creditors are *quasi* parties to a suit brought for the dissolution of a copartnership, an accounting, and the distribution of the partnership property. They are entitled to come in under the decree for distribution, and prove up their demands before the master; and they thus become incidentally the objects of protection by the court. In the case of a creditor's bill suit, it is not necessary that all the creditors should be made parties complainants. It is sufficient that one creditor files the bill, with the suggestion that others who voluntarily come in and share the expenses, may participate of the proceeds on distribution. All the creditors, thus contributing, are entitled to equal favor, and it would not be insisted that collusion, between the complainant and defendants on the record, would be allowed by the court to work a defeat of the objects of the bill, by hastily dismissing the cause.

11. The bill in this case sets forth the names of the creditors prayed to be made the beneficiaries, and the respective amounts due each. The answer of the defendant, Newell, admitted them as stated in the bill. It is insisted, that this alone gave the demands of the creditors the effect of a judgment and lien on the assets in the hands of the receiver, the same as on a decree for an accounting, and the report of a master as to amounts due

Doss et al. *v.* Tyack et al.

creditors, in a case where they had not been in form made parties to the suit. In such case, after decree for accounting, and the establishment of the demands of creditors on reference to a master, the suit cannot be dismissed by the consent of complainants and defendants. Lashley *v.* Hogg, 11 Vesey, Jr. 602. What the creditors were entitled to by way of decree, as shown by the bill and answer, it is urged, could not be defeated by the fraud or collusion of the parties named as complainants and defendants on the record.

12. There is a large class of suits in equity where the power of the court must of necessity extend far beyond the immediate parties named as complainants and defendants. Of this class, are the bill for dissolution and accounting — the creditor's bill; bills against insolvent corporations, and others, where the proceedings are attended with the distribution of assets that have assumed the aspect and nature of trust property. The parties named in such suits as complainants, are considered as the representatives of all the interests that may be beneficially affected by the decree. After they have brought the matters into court, and invoked its aid and power, it would be too late to withdraw the subject-matter of litigation from the court. Were it otherwise, there would often be no remedy, from the impossibility to make parties. The most a court of equity could possibly do, under a sound discretion, would be, to allow a complainant, acting in bad faith, to retire from the suit on terms, in the mean time retaining the fund, and allowing others to come in, whose fidelity could be better depended upon, in carrying the trust property to a fair distribution.

13. Copartnership property (more especially in cases of insolvency) is strictly regarded as trust property, and the creditors of the copartnership, the *cestuis que trust*, or beneficiaries; and this, independent of any instrument or agreement making an assignment, or declaring the trust; hence the uniform practice of courts of equity in extending protection to their interests.

14. In the case at bar, it will be seen that the copartnership property had been placed, and tied up, on the application of complainants, for more than one year, in the hands of the receiver, in a condition that made it invulnerable to the creditors, except through distribution by the court. It was in the custody of the law, and could not be levied on. The remedy of the creditors against the property was suspended. The dismissal of the bill and delivery of the copartnership property to Doss, would have given the effect of having used the court to delay the creditors, and then, of prostituting its powers to defeat them. It is believed that courts of equity have power to exempt themselves from being used as instruments for such purposes.

15. It may be said, perhaps, that the case at bar is *sui generis;* that there is no precedent, in all respects, applicable to the questions involved in the motion to dismiss this cause in the court below. If so, it is respectfully submitted whether principles, applicable to the circumstances of this case, should not be declared, as well for the benefit of courts of original jurisdiction, as for the instruction of solicitors and counsel respecting their rights, duties, and responsibilities.

Mr. Justice GRIER delivered the opinion of the court.

A short history of the facts of this case, extricated from the numerous allegations of the pleadings and the mass of testimony contained in the record, will better exhibit its merits than a more formal abstract of the pleadings and proofs.

The appellees, who were complainants below, entered into articles of agreement with Samuel Newell, one of the respondents below, on the 25th of September, 1847, in which they engaged to form a copartnership under the form and style of William Tyack & Co., in New York, and Stewart, Newell & Co., in Galveston, Texas. " The nature of the business to be transacted by said firm to be a commission, general, and auction business." The parties each to contribute towards the capital stock the sum of five thousand dollars, within ninety days; the capital to be augmented as the business required; Newell, " in consideration of his expense and labor in paving the way for the contemplated business, as well as his influence in the State of Texas, to be entitled to one fourth of the profits, and the balance to be equally divided between the three partners. Tyack and Murray to take charge of the business in New York, and Newell in Galveston.

At the time these parties entered into this contract of partnership, their several ability to perform their agreement of advancing capital and supporting the credit of the firm, as shown by the pleadings and evidence, would appear to be as follows: Tyack was worth, in all, probably twenty thousand dollars; Murray had nothing, and owed about five thousand dollars; Newell, while resident in Texas, " had become interested in a claim belonging to Alexander Edgar, to a league of land," on which it was supposed that the city of Galveston was built. He had come to New York, at this time, with a power of attorney from Edgar, to form a stock company of persons, who were to have an interest in this litigated claim. He had divided it into one thousand shares, to be sold at one hundred dollars each, payable in instalments. He was to have half of all the money received for the stock, over twenty thousand dollars. A few persons had been persuaded to subscribe for some of this stock, and

among others, Tyack and Murray had each agreed to take a few shares; and Tyack was appointed treasurer of the company under the name of " The Galveston Land Company." Newell's property or capital consisted in the anticipated profits of this speculation, and some stock in another company, called the " Wilson Joint Stock Land Company."

The partners soon afterwards commenced business on about four or five thousand dollars, advanced by Tyack. Murray had nothing, and Newell's stocks would produce nothing in the market; those who had before subscribed for it, refusing to pay, on the plea or suspicion that it was good for nothing, as the citizens of Galveston had probably a better title to the land than the company. Thus the source from which Newell's capital was anticipated, wholly failed.

In the mean time a stock of goods was purchased for the house in Texas, costing about twenty thousand dollars, for the payment of which Newell had drawn bills on Tyack & Co. for some seventeen thousand dollars, which Tyack had accepted, in expectation of remittances of cotton or other produce from Texas, by Newell, to meet the bills at maturity. The business expected to be transacted by Tyack & Co. in New York, was the disposal of these consignments from the Texas house — of cotton and other merchandise purchased with the funds of the firm in Texas.

In March, 1848, the acceptances in New York being near maturity, and the consignments received from Newell to meet these large liabilities, amounting only to about eight hundred dollars, Tyack, to avoid impending bankruptcy, if possible, called together the creditors of the firm and made a statement of its situation. In consideration of the creditors agreeing to give further time on the acceptances about to mature, Tyack & Murray executed a power of attorney to William E. Warren, an agent chosen by the creditors, authorizing him to take possession of the property and effects of the firm in Texas, and secure them for the benefit of the creditors. Warren was authorized by the creditors to act for them, and to collect, secure, or compromise their claims, in any way he thought best; with instructions to proceed to Texas, and examine into the state of the firm, and if it was found that there was any probable prospect that the firm could eventually pay their debts, to make any reasonable arrangement for that purpose, and suffer Newell to continue the business: on the contrary, if Newell could hold out no such prospect, or if he was found to be wasting the goods of the firm, and appropriating them to any other purpose than the regular mercantile business of the firm, the agent was instructed to get possession, by all legal means, of the partner-

ship assets, and hold them or dispose of them in the best man-ner for the interests of the creditors and all concerned.

In pursuance of this authority, Warren proceeded to Galves-ton. He there found the assets in Newell's possession insuffi-cient to pay the debts, and that the firm was hopelessly insolvent; and moreover, that Newell had appropriated a portion of the assets of the firm to the payment of his personal debts, incurred in his land stock speculations, and was unwilling to comply with any reasonable terms of compromise, to secure the cre-ditors, or save his partner, Tyack, from insolvency and ruin.

Warren then instituted proceedings in the State Court on behalf of Tyack and the creditors, and obtained an injunction and a writ of seizure against Newell, on which the sheriff took possession of the property of the firm. On the 10th of July, 1848, on motion of Newell's counsel, the court, for some reason, set aside the injunction and writ of seizure. The counsel for Tyack and the creditors, immediately discontinued their proceed-ings in the State Court, and commenced proceedings in the District Court of the United States. While the bill for that purpose was being prepared, and application being made for an injunction and the appointment of a receiver, Newell and one Peter McGreal proceeded in hot haste from the court house, got possession of the goods from the sheriff, and had the following instrument of writing executed:

"Received, Galveston, July 10, from S. W. Doss, of Brazoria, the following amounts: Two thousand dollars, in good notes, mortgages, liens, and judgments, and seven thousand seven hundred and fifty-three dollars in lands, full payment of the stock of goods, wares, and merchandise now in our store in Galveston.                                   STEWART NEWELL.

"Recap.— Cash, $2,000; Notes, $2,000; Lands, $7,753— To-tal, $11,753.

"In presence of John Warrin, Isaac D. Knight."

No notes, judgments, or liens, were in fact assigned by McGreal to Newell, nor any conveyances of land made; but McGreal gave his written promise to assign and convey securities and lands to that amount within thirty days. The production of the two thousand dollars cash, was also dispensed with, as the parties appear to have been in too great haste to be particular. The answer of Newell attempts to account for the cash as follows:

"This defendant states, that the said first payment in cash of $2,000, mentioned in said receipt, was secured and made to this defendant by Peter McGreal, Esq., the agent of said Doss; that a portion of said sum of $2,000, to wit, about $1,200, was paid by the said McGreal, agent as aforesaid, to Benjamin C.

Franklin, Joseph A. Swett, and John B. Jones, in pursuance of, and in accordance with, an order given by this defendant to said McGreal for that purpose; that forty-two dollars and fifty cents were paid upon the order of this defendant to J. A. Sauters for rent of said store, due by said firm; and the balance, to wit, about seven hundred and fifty dollars, was directed by this defendant to be paid over or secured to Isaac D Knight, to be by him held to the use of the firm of S. N. & Co., to be paid over for the said use upon the order of this defendant, in like manner as the said book debts and other choses in action assigned to said Franklin, as above mentioned."

What right Franklin, Swett, and Jones had, to receive this money, or how, or why it was paid to them, (if it was paid,) or how Knight, the brother-in-law of Newell, became a trustee for the creditors of the firm, the answer does not disclose.

McGreal appears also to have treated Newell with the same unbounded confidence which Newell had reposed in him. He took the goods on trust, as to quantity and quality; required no invoice or schedule, being content with one which the sheriff had made; and immediately commenced to pack them up and seek for assistance and means for carrying them off. The transaction commenced after twelve o'clock in the day, and by twelve o'clock at night, a large portion of the goods were put on board the sloop Alamo, which set sail before morning. In the mean time the bill in this case had been filed, and a receiver appointed, who, on the following day, (11th July,) was enabled by means of a writ of assistance, to arrest the sloop and get possession of the goods.

It is unnecessary to enumerate all the charges of the bill, and the answers thereto, as it is amply sufficient for the purposes of the decision in this case, that the facts we have already stated were either admitted by the answers, or undeniably proved.

The plaintiff in error, Stephen W. Doss, who claims to be the owner of the goods, thus alleged to have been purchased by Peter McGreal, was made a party to the suit. Both he and Newell deny, in their answer, all fraud in the transaction, and Doss avers, "that the said transaction was made in the regular mode of conducting such business, and at a time when there was no lawful restraint existing to prevent the sale and delivery of the goods."

On this case the court below, at the March term, 1850, rendered a decree for the complainants, dissolving the partnership, setting aside the sale to McGreal, or Doss, as fraudulent, and ordering the receiver to pay over the proceeds of the goods, (which had been previously sold by order of the court,) to the creditors of the firm.

But, in order rightly to apprehend the points relied on by the counsel for appellants, in claiming a reversal of the decree, it will be necessary to state some of the intermediate proceedings in the case, as exhibited by the record. During the pendency of the suit, Newell and McGreal had gone to New York, and persuaded Tyack & Murray to revoke the power of attorney given to Warren, and to execute one to the respondents' counsel, authorizing them to dismiss the bill; and a motion was made by them, for this purpose, in August, 1848. This motion was resisted, on the ground that the firm was wholly insolvent; that the power to Warren was given on a contract with the creditors, and for a valuable consideration, and was, therefore, irrevocable; as it would be a fraud in Tyack to dismiss the proceedings, for the benefit of the creditors, after the great trouble and expense incurred by them for the purpose of protecting Tyack from ruin. Notwithstanding these objections, the court ordered the suit to be dismissed; but, some days after, at the same term, vacated and set aside this order or decree, on proof, that the revocation of the power to Warren, and the order given to discontinue or dismiss the proceedings, were obtained from the complainants by gross misrepresentation and fraud. Afterwards, an issue was ordered, on prayer of respondents' counsel, to try the question of fraud. This issue was tried before a jury, who rendered a verdict that "the sale was fraudulent." Whereupon, the respondents moved for a new trial, on the ground that the verdict was given "under a misconstruction and misunderstanding of the charge of the court." This motion was founded on an affidavit of some of the jurors that, "on their retirement, they did not inquire into the right and power of Doss to purchase, nor of the question of fraud on Doss's part, but only into the right and power of Newell to make the sale."

We are now prepared to examine the points relied upon for the reversal of this decree.

They are, 1st. That the court had no power to set aside the order or decree, dismissing the bill, unless, on a new and original bill, filed for the purpose. 2d. That, on this certificate of the jury, the court should have granted a new trial on the question of fraud.

1. As regards the first point, we perceive no error in the action of the court, except in their first order dismissing the suit. It did not require an original bill, to authorize the court to vacate an order or decree, at the same term in which it was made, on discovering that they have committed an error, or that the consent of the complainants to such dismissal was obtained by the fraud of the respondents, or their agents. In fact, under

such circumstances, it cannot be said that the act was done by the consent or will of the complainants, at all. The court, in vacating the decree, were correcting an error both of fact and of law; and, during the term at which it was rendered, they had full power to amend, correct, or vacate it, for either of these reasons.

2. The second point is equally without foundation. It is true, that the answers of the respondents denied fraud in the abstract, but they admitted all the facts and circumstances necessary to constitute it in the concrete. The general denial of the answer, only showed that the definition of fraud was much narrower, in the estimation of the respondents, than in that of courts of law and equity. In this case, a verdict was wholly unnecessary, to inform the conscience of the Chancellor; and, the verdict being perfectly correct, the court very properly refused to set it aside, on any representation from jurors thus obtained.

Any argument to vindicate the correctness of the verdict and the decree of the court below, after the exhibition of the merits of this case, which we have given, would be entirely superfluous.

The decree of the District Court of Texas, is therefore affirmed.

### Order.

This cause came on to be heard, on the transcript of the record, from the District Court of the United States for the District of Texas, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed, by this court, that the decree of the said District Court in this cause be, and the same is hereby, affirmed, with costs.