CORNUE v. INGERSOLL et al.

CUMMINGS v. SAME.

(Circuit Court of Appeals, First Circuit. February 16, 1910.)

Nos. 850, 851.

1. JUDGMENT (§ 829*)—COLLATERAL ATTACK—JUDGMENT IN REM.

A decree of a federal court, establishing a lien on a fund, cannot be collaterally attacked by a suit in a state court, in which the complainant asks to be adjudged owner of the fund.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1510–1515; Dec. Dig. § 829.*]

2. COURTS (§ 493*)—SUIT IN CONTEMPT OF FEDERAL COURT—DISMISSAL.

A decree was entered by a Circuit Court of the United States, on a mandate from the Supreme Court, adjudging a lien on a fund in the hands of an ancillary administrator. Complainants, claiming an interest in such fund, during the same term at which the decree was entered, and while it was still under control of the court, instituted suits in a state court, asking that they be adjudged owners of the fund to the exclusion of the complainant in the decree, who as a defendant removed such suits into the Circuit Court. Held, that such court properly took jurisdiction and dismissed the suits, as in contempt of its decree and an attempt to interfere with its execution.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 493.*]

Appeals from the Circuit Court of the United States for the District of Massachusetts.

Suits in equity by Ellen S. Cornue and Herbert P. Cummings, executor, respectively, against Eva A. Ingersoll, administratrix, and others. Decrees of dismissal (174 Fed. 666), and complainants appeal. Affirmed.

The two bills of complaint at issue were instituted in the state court, and were directed against a fund in one of the probate courts of Massachusetts upon which a lien had been established under direction of the Supreme Court of the United States, in favor of Eva A. Ingersoll, administratrix of the estate of Robert G. Ingersoll.

Identity of subject-matter, and the complainants' knowledge of the pendency and progress of the lien proceeding in the federal courts, and of the "judgments and decrees therein," are shown by the allegations of the bills.

Among the allegations which appear in each bill are the following:

"Fourth. * * * And thereupon said contestant party duly executed an assignment agreement and power of attorney, a copy whereof is hereunto annexed, marked 'Exhibit 1,' and made a part hereof, by the terms of which said Cummings, Ladd, Dunbar, and Cornue assigned to said Root and one Gideon Wells, now deceased, one-third (⅓) of their several interests in said estate out of which to reimburse said Root for all sums expended or to be expended on account of the settlement of said estate and opposing the probate of said will, the said Root to have the remainder of said one-third (⅓) as compensation for his time and services. * * *" (Exhibit 1 is dated September 25, 1890.)

"Forty-fifth. Said cause proceeded in said Circuit Court of the United States and in the Circuit Court of Appeals thereof, and on certiorari in the Supreme Court of the United States; and said Supreme Court remanded said cause with directions for the entry of a decree establishing said debt and subjecting three hundred sixty-eight and three-fourteenths eleven-hundredths (368³/₁₄/1100) of such fund as might be distributed in Massachusetts under the order of the probate court of the county of Suffolk in said estate of Andrew J. Davis, deceased.

"Forty-sixth. In said cause no evidence was presented to said courts, or any of them, to show the fact aforesaid that said Root and said Coram had already, from the prior distributions of said estate, withdrawn their entire portion of said five hundred fifteen and one-half eleven-hundredths (515½/1100) of said estate, and said courts did not pass upon, or have jurisdiction to pass upon, the rights of said Cummings and said Cornue in the premises, and said suit and the proceedings therein, and the judgments and decrees therein, are wholly without effect upon the rights of said Cummings and said Cornue."

"Forty-ninth. As against the complainant there is no debt due to the administrator of the estate of Robert G. Ingersoll from any person by reason of anything done by said Ingersoll in connection with the estate of said Andrew J. Davis, deceased."

Exhibit 1, referred to in paragraph 4, contains the following:

"And we, the said Sarah Maria Cummings, Elizabeth S. Ladd, Ellen Cornue, and M. Louise Dunbar, do hereby severally constitute and appoint the said Henry A. Root and Gideon Wells our attorneys in fact, irrevocable, for us, and each of us, and in our and each of our names, place, and stead, jointly to demand, sue for, collect, receive, compound, receipt for, and full acquittance give for our and each of our interests in said estate."

The prayers of the bills were as follows:

"First. That it be determined by this court to what extent the complainant is entitled to have and retain the funds aforesaid upon and after the distribution of them under the order of the probate court, and that the complainant have a decree awarding said funds to complainant, as claimed in the bill of complaint.

"Second. That it be determined by the decree of this court in what manner any deficiency in said funds shall fall upon said Ellen S. Cornue and said Herbert P. Cummings as executor as aforesaid.

"Third. That the conflicting claims of the respondents upon the funds to which the complainant is entitled as aforesaid be denied.

"Fourth. That a receiver be appointed by this court to take, on behalf of the distributees designated by the probate court or said District Court, from said John H. Leyson the funds as aforesaid to the extent of five hundred fifteen and one-half eleven-hundredths (515½/1100) thereof, and that said receiver hold said portion of said funds and distribute the same in accordance with the decree of this court.

"Fifth. That said five hundred fifteen and one-half eleven-hundredths (515½/1100) of said fund be charged by decree of this court with a trust in favor of the complainant to the extent of the portion in equity due the complainant as set forth in the bill of complaint, and that any of the respondents to whom said five hundred fifteen and one-half eleven-hundredths (515½/1100) or any part thereof may come shall hold the same in trust for the complainant to the extent of the sum in equity due the complainant as aforesaid, and shall pay the same over to the complainant to such extent.

"Sixth. That the respondent Leyson be enjoined from removing said funds or any part thereof from this commonwealth, or otherwise dealing with the same, except as he may be so ordered by the probate court for Suffolk county.

"Seventh. That the remaining respondents, and each of them, be forthwith enjoined from receiving five hundred fifteen and one-half eleven-hundredths (515½/1100) of said fund or any part thereof except through a receiver or other officer of this court.

"Eighth. That this cause proceed to hearing and final decree in the absence of those respondents who are not residents of this commonwealth and who do not appear in this suit.

"Ninth. That the complainant have such other and further relief and such process as this court deems meet and proper."

These cases were removed from the state courts upon the ground of diverse citizenship, together with allegations as to the nature of the prior proceedings in the United States courts and the present proceedings in the state courts with reference to the same supposed subject-matter, which, it is claimed, raised a federal question. On the 25th of May, 1909, they were under hearing upon motion to remand, and were dismissed, and a final decree was entered as follows:

"Putnam, Circuit Judge. On hearing before the court, ordered. motion to re-mand bill denied, and bill dismissed, with costs, but without prejudice to any proceedings arising between persons interested in the estate of Andrew J. Davis, deceased, after the final decree in Ingersoll v. Coram entered by this court has been fully performed."

Subsequently the following rescript was filed as of May 25th, which shows the ground upon which the cases were dismissed:

"Putnam, Circuit Judge. The above cases came before us on motions to re-mand to the state court. On hearing the motions we denied them. We also entered summary decrees dismissing each bill, with costs, but without prej-udice to any questions arising between the parties interested in the estate of Andrew J. Davis, deceased, after the decree in Ingersoll v. Coram, entered by this court, has been fully performed. These orders and decrees were entered with an oral expression of our views in reference to them; but, inasmuch as the complainants in each of those cases have signified to us an intention to take an appeal to the Circuit Court of Appeals, we now deem it proper to file this brief statement of the oral views thus expressed.

"We sufficiently identified the proceedings in Ingersoll v. Coram by a ref-erence to the mandate from the Supreme Court in that case, which was filed in this court on January 25, 1909, pursuant to which mandate final disposition of Ingersoll v. Coram was made by this court. That mandate established the judgment of this court in favor of Ingersoll, administratrix, with a modifica-tion which appears therein, and which need not be stated particularly in this rescript.

"The bill in equity in the foregoing cases described quite fully the proceed-ings in Ingersoll v. Coram and the result in this court as we have stated it. The view we took of each of those bills was that on their face they not only set out the proceedings in Ingersoll v. Coram and the final judgment therein, but also on their face operated to delay, embarrass, and, perhaps, to some ex-tent defeat, the appropriate execution of our judgment in accordance with the mandate to which we have referred; and we were of the opinion that it appeared on the face of each of those bills that such was the purpose of each of them. At any rate, we were of the opinion that they did so operate as a matter of fact, and that on their face they set out sufficient to establish that they operated in the manner we have said, and that, therefore, on their face each raises such a federal question as justified removal to this court. We were also of the opinion that, as they were at least by implication of law contemptu-ous in their nature, we were justified in taking and maintaining jurisdiction over the same even in a summary manner. Therefore we refused each motion to remand.

"Also we were of the opinion, by reason of the operation of each with ref-erence to the judgment of this court, especially with reference to the mandate from the Supreme Court, and from their contemptuous nature in implication of law, that the court in which the bill was originally filed had no jurisdiction over the subject-matter of either of them, and that, therefore, each bill should be dismissed. Moreover, in order to prevent their practical operation in delay-ing and embarrassing the execution of the judgment and mandate aforesaid, which would result if we permitted the litigation to be continued even in this court, we were of the opinion that the only remedy suitable under the circum-stances was summary dismissal.

"We were strengthened in our conclusions by the expressions found in the opinion of Judge Aldrich, passed down in behalf of the Circuit Court of Ap-peals in O'Connell v. Mason, on August 25, 1904, reported in 132 Fed. 245, 247, 65 C. C. A. 541, 543, where the following is found:

" 'We have no doubt of the inherent and necessary power of courts of gen-eral jurisdiction to protect members of the public from vexatious suits through an exercise of the right to dismiss frivolous proceedings which, upon the face of the pleadings, present no cause of action recognized by the law. Unques-tionably the power to dismiss exists quite independent of express statutory authority, and may be exercised in a proper case by the court of its own mo-tion.'

"The clerk is directed to file this rescript in each of the above cases the day it is dated, adding, also, 'nunc pro tunc as of the day when the motion to remand was denied and the bill was dismissed.'"

From the final decree the complainants claimed an appeal to the United States Circuit Court of Appeals for the First Circuit.

Edward F. McClennen (Brandeis, Dunbar & Nutter, on the brief), for appellants.

E. N. Harwood (Hollis R. Bailey, on the brief), for appellees Ingersoll and others.

William T. Read, for appellee Holton.

Horace G. Allen, for appellee Leyson.

Before COLT and LOWELL, Circuit Judges, and ALDRICH, District Judge.

ALDRICH, District Judge (after stating the facts as above). These two cases were summarily dismissed by the Circuit Court, upon its own motion, upon the ground that they were in contempt and evasion of law and in defiance of a final decree entered under the order of the Supreme Court. Ingersoll v. Coram, 211 U. S. 335, 29 Sup. Ct. 92, 53 L. Ed. 208; opinion of Circuit Court November 17, 1909, 174 Fed. 666. See, also, 148 Fed. 169, 78 C. C. A. 303; 136 Fed. 689.

They were originally commenced in the state courts of Massachusetts, and were removed to the Circuit Court of the United States upon the ground of diverse citizenship, and upon allegations which it is claimed raise a federal question upon the face of the bills. They are based upon an alleged out of court arrangement in Montana between five heirs of Davis, after a part of the estate had been passed over to the group en masse and without division, whereby Root and Coram retained more than the distributive shares of Mrs. Cornue and Mrs. Cummings to meet the expenses of litigation and other expenses, under an arrangement and under circumstances which, it is said, contemplated that the complainants' interests should be made good in the end out of the funds in Massachusetts. Thus they in effect say that their claim is one which should cut under the lien, upon the ground that they acquired title to the property from Root and Coram earlier than its creation; and it is conceded that, if this claim is established, it will absorb the entire fund against which the lien decree of the federal court is directed. In other words, in effect and substance, the complainants say that they individually own the entire property now in the probate court of Massachusetts against which the decree of the federal court is directed, and that they own it by virtue of a segregation and private adjustment of the community interests made between the heirs before the lien, and consequently that there is no property upon which the lien can operate. Such being their claim, the complainants could not have expected or even hoped to prevail in an independent proceeding in the state courts, except upon the hypothesis of a judgment based upon findings and holdings that the express terms of the decree of the Circuit Court, entered in accordance with the opinion of the Supreme Court, are invalid and inoperative in respect to the property in question.

It was plainly the purpose to secure a result in another court which would wholly prevent the execution of the decree of the Circuit Court of the United States. With that purpose, the complainants invoke independent collateral proceedings in another court, through which it is intended to drive a fatal blow at the right established by the decree of the Circuit Court. Indeed, the purpose is made quite plain by the allegations and prayers, which plainly mean, if they prevail, a complete and effective overthrow and nullification of the operative effect of the decree of the Circuit Court in respect to the property right which it assumed, in clear and unmistakable terms, to declare and establish. If such process is possible by way of collateral attack, the inevitable result would be a direct conflict between the two courts, and direct conflict between their final decrees directed against the same specific property, because the decree of the Circuit Court assumes to define the status of the property right, and the decree sought in the state court is one which would completely nullify, not only the operativeness, but the express terms, of the decree of the Circuit Court, which was a court of competent jurisdiction, and one which had first assumed control over the subject-matter in controversy.

To the proposition that the subject-matter of the controversy in question was something which might be dealt with finally and effectively in the federal courts, it is only necessary to refer to the recent decision of the Supreme Court in Waterman v. Canal-Louisiana Bank, 215 U. S. 33, 30 Sup. Ct. 10, 54 L. Ed. —— (December, 1909), and to the familiar general rule that, as between two courts of competent jurisdiction, the one which first assumes jurisdiction over a controversy will hold it for the purpose of ascertaining and establishing the controverted rights.

These proceedings, notwithstanding the proper jurisdiction of the federal courts, seek in the end to seize and hold a property now in the custody of the probate court of Massachusetts, notwithstanding, and in violation of, a final decree entered against it in accordance with the decision of the Supreme Court of the United States, in which that court declared a right in respect to the same property which it specifically described and named. Thus, at their inception, they seek a result in a collateral proceeding which would utterly set at naught the authority of the Supreme Court sought to be enforced, with respect to subject-matter over which it had assumed jurisdiction, and in respect to a right which it had assumed to establish, through a final decree entered under its direction at the end of litigation. An independent proceeding to such an end would be subversive of judicial authority; and a rule which would permit it would put at unrest and in disorder rights supposed to have been settled and established by courts of competent jurisdiction and of last resort.

Previous to the will contest, the Ingersoll service, and the lien litigation, a one-third interest of Mrs. Cornue and of Mrs. Cummings in the Davis estate was assigned to Root and another, "to be expended on account of the settlement of said estate and opposing the probate of said will." The fact of such assignments was before the Supreme Court (211 U. S. 335, 337, 29 Sup. Ct. 92, 53 L. Ed. 208), and is established for purposes of this case, because it is set out on the face of

the present Cornue and Cummings bills, at paragraph 4, and the established fact of the assignments is something important to be considered upon the question of estoppel and adjudication. The decree in the Circuit Court, so far as the Cornue and Cummings interests were concerned, took jurisdiction over that one-third only, and it is not understood that the decree operates upon any interests other than those of Root and Coram as enlarged, of course, by the assignments of the one-third interests of Mrs. Cornue and Mrs. Cummings and others. If these complainants had any possible interest in the one-third which they had conveyed, the only part of their interests upon which the decree operated, that interest, as was doubtless assumed by the Supreme Court, was represented in the original lien proceedings by their assignees and by the administrator, who had the custody of the property, who answered, and who rightfully represented whatever community interest there was centering in the estate over which he had control.

It must be remembered that the lien proceeding was quasi in rem (Black on Judgments, §§ 792–795), and in no sense was the decree in personam as to these complainants. The decree operated in rem only as to the Cornue and Cummings interests in the hands of Root and Coram, who were the assignees, and held, in addition to their own original interests, the legal title to the Cornue and Cummings interests to which the lien attached. It must also be remembered that the independent proceedings in the state courts were in no sense proceedings to correct or modify a decision which the court having custody of the res had assumed to make; but they are proceedings which entirely ignore and set at defiance all that has been done in respect to the res, over which at least the court had rightful and unquestionable jurisdiction. The subject-matter, in the lien sense, so far as concerns the shares of these complainants, with which they had parted title, was the one-third interest upon which the lien is asserted, and over this the United States court had properly assumed jurisdiction, and had established a right by its decision.

Among the higher duties of courts is that of seeing that their final process is effective to secure and establish the rights which, at the end of litigation, are found to exist. The Supreme Court charged the lien upon specific property interests which were described in apt words. The effect of the decision was to attach the lien to the property and create a right therein in behalf of the Ingersoll estate.

The decision of the Supreme Court is to be accepted as it is expressed, and we deem it neither necessary nor proper to attempt any defense or explanation of the result reached, further than to say that the fact of the assignments was before the Supreme Court (211 U. S. 335, 370, 29 Sup. Ct. 92, 53 L. Ed. 208); that upon such status of legal title to the one-third, with such parties as the Supreme Court had before it, and upon such representative conditions as existed in respect to the res through the appearance of the assignees of the one-third Cornue and Cummings interest and the Cummings answer (211 U. S. 335, 342, 29 Sup. Ct. 92, 53 L. Ed. 208), and upon such representative capacity as was involved in the appearance and answer (211 U. S. 335, 342, 29 Sup. Ct. 92, 53 L. Ed. 208) of the administrator of the estate, who had

custody of the community interests, and who joined in the common purpose to defeat the lien, that court assumed to establish the right.

Upon argument the complainants put their case upon the ground that the decree of the federal court amounts to a judicial invasion of their rights without notice. The complainants, at least, had knowledge of the lien proceeding and the Supreme Court decision at the time they started these suits in the state courts, and, having that knowledge, and feeling aggrieved, they might well have acted with the regard ordinarily held for a final decision by a court of competent jurisdiction. An orderly and appropriate remedy would have been some one of the usual and well-known proceedings in the nature of intervention to correct the decree, like a bill in the nature of a bill in review, like an auxiliary bill in equity joining all the parties, or any one of the simple intervening petitions for that purpose, which addresses itself to the court charged with the duty of enforcing its final decree, to the end that it may be corrected if wrong is being done. Such a proceeding would become a part of the case before the court which had assumed to establish a right, and one, of course which would naturally involve all necessary and proper considerations of notice and estoppel. Such proceedings were invented to avoid circuity of action, multiplicity of suits, and the menace to rights involved in threatened judicial conflict, and to meet situations like the one in question, and to afford a full, proper, and adequate remedy. Such remedies are based upon the charitable assumption, usually indulged, that a court of competent jurisdiction can do justice and right wrongs, if, through inadvertence, its decrees are operating too broadly.

We take judicial notice of the scope of the lien proceeding and of what had been decided in the Circuit Court, the Court of Appeals, and the Supreme Court, as well as judicial notice of the important fact that the term of the Circuit Court, in which the decree was entered, was still open. The February term of the Circuit Court begins on the last Tuesday of February and ends on the third Tuesday of October. The decree was entered April 15, 1909, and thus the lien decree directed by the Supreme Court was within the control of the Circuit Court at the time the complainants instituted their proceeding in the state court.

The term being open, the cases which hold that federal courts lose control of their decrees at the end of the term have no application whatever, and the power of the Circuit Court, upon apt proceedings, to correct its decree, if an inadvertent wrong was being done, was at that time something beyond question. Ex parte Lange, 18 Wall. 163, 21 L. Ed. 872; Goddard v. Ordway, 101 U. S. 745, 752, 25 L. Ed. 1040; Ætna v. County Commissioners, 79 Fed. 575, 25 C. C. A. 94; Phillips v. Negley, 117 U. S. 665, 675, 6 Sup. Ct. 901, 29 L. Ed. 1013; Freeman on Judgments, § 100; Black on Judgments, §§ 301, 305; Seton on Decrees, c. 787; 2 Daniell, Ch. Pl. & Pr. (6th Ed.) §§ 1026, 1027; 17 Am. & Eng. Enc. Law (2d Ed.) 837.

If there was a grievance, it was not necessary and justice did not require resort to independent process in another court—process which in substance and effect, if maintained, must entirely ignore the intended operative effect of the decision of the Supreme Court. Thus

the conclusion is inevitable that the purpose was to get away from the court exercising jurisdiction in respect to the subject-matter of the property in question, and which had assumed to establish a right, and to seize and hold through the instrumentalities of state process property which the Supreme Court had assumed to decide belonged to another party.

The complainants urge their supposed grievance with surprising and unusual warmth and vigor, upon the erroneous supposition that the failure of the Circuit Court to loosely abandon and recede from its own final mandate under subversive collateral attack left them without redress, and that important and sacred property rights have thus been wrested from them, and great wrong done, through judicial intervention without notice, and in violation of fundamental law. The argument which involves the claim of judicial invasion is an unfortunate one. We are reluctant to accept such an argument seriously, because we do not think the premises in this case warrant it. Moreover, the history of American courts is not one of judicial invasion. Courts are usually content if they succeed fairly well in the direction of orderly procedure, in the avoidance of unseemly conflict of judicial authority, and in making their decrees effective to establish rights which it is found that parties are entitled to.

Aside from the idea of having intervening and ancillary remedies, with scope and function sufficient to avoid circuity of action and multiplicity of suits, and of affording direct remedies and opportunities for redress in the same court, to the end that useless conflict shall not occur between different courts, is the other idea that judgments and final decrees shall not be subject to collateral attack. If adverse independent collateral proceedings like these were recognized and encouraged, property rights would be in confusion, and all sorts of conflict of jurisdiction and decision would result, and in the end, logically and necessarily, force; because with two adverse decrees in rem, and neither party yielding, how, in the last analysis, could the property right be at rest, except through force? Surely each of two adverse independent final decrees in rem could not effectively operate to take the whole of a specific property.

Speaking with moderation by way of characterization of the particular proceedings in question, they are in their nature insidiously and alarmingly well calculated to bring courts, which aim to exercise their respective rightful jurisdictions under motives and principles of useful comity, into direct, open, and unseemly conflict upon final process. It was to avoid deprecated conflict of judicial authority that rules against collateral attack upon judgments and final decrees, as well as ample remedies in the nature of direct attack, were invented and enlarged, to the end that parties claiming to be aggrieved by the operation of a decree without notice may have their day in court and full redress.

The rule which requires direct attack and forbids collateral attack upon final judgments and decrees is a rule of public and judicial necessity, and is founded upon considerations which wholly exclude the idea of a laxity which shall tolerate an independent collateral proceeding to disestablish in another trial that which has been expressly es-

tablished upon a former trial upon the merits. As argued, it is true, a plea in bar may furnish a remedy against this; but that is not the only remedy, and where the identity of the property is unmistakable, and the purpose to disestablish the result of a former adjudication is clear, courts may not always subject parties to another trial upon a plea in bar, and to the expense and delay incident to such a defense.

In its consideration of the question of contempt and evasion of law, and what had theretofore been decided in respect to the property in question, the Circuit Court was not dealing with the question whether the state court had in fact assumed jurisdiction, whether a plea in bar would be effective in that court or any other, or at all with the question as to what the state court would probably do or not do. It was only dealing with the purposes of the complainants, in view of its own knowledge as to identity of parties and property, and as shown upon the face of their bills.

These proceedings, instituted in one court to disestablish or render inoperative what had been established in another, were removed to the court which established the right sought to be overthrown; and that court, having before it the cases upon motion to remand, without deciding or considering the question of diverse citizenship, or other particular grounds upon which they were removed, finding them to be in contempt of law and of what it had done under the direction of the Supreme Court, denied the motion to remand and summarily dismissed them.

Having found the proceedings to be in contempt and in evasion of the decision already made, we are not aware of any imperative rule of law which required the Circuit Court to lend potency to their existence by considering the question of diverse citizenship, or, on motion of the complainants, who held its decrees in contempt, to lend force to their offending purpose by remanding their cases to the state court. If the requisite diverse citizenship did not exist, as the complainants claimed, surely the order of dismissal violated no substantive right.

These cases having been removed to the Circuit Court, that court treated the proceedings as not ancillary, but in contempt of what the federal court had decided and was doing, and dismissed them, and the order or decrees should be affirmed. In each case the decree is as follows:

The decree of the Circuit Court is affirmed, and the appellees recover their costs of appeal.