## GODDARD *v.* ORDWAY.

The Supreme Court of the District of Columbia affirmed a decree and allowed an appeal therefrom which was not perfected. A motion, whereof the adverse party had due notice, was thereupon made and entered on the minutes to vacate the affirmance and grant a reargument. Not having been acted upon, it was, by the general course and practice of the court, continued as unfinished business. *Held,* 1. That the motion prolonged the suit, and the parties thereto were in court until it should be finally disposed of. 2. That under such circumstances it was competent for the court at the ensuing term to grant the motion, vacate the allowance of an appeal to this court, and pass a decree of reversal.

APPEAL from the Supreme Court of the District of Columbia. The facts are stated in the opinion of the court.

*Mr. Walter D. Davidge* and *Mr. A. S. Worthington* for the appellant.

*Mr. Richard D. Merrick* and *Mr. Martin F. Morris* for the appellee.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This appeal presents the following case : —

During the summer of 1871, Albert Ordway, the appellee, was engaged in securing a contract with the government to furnish and cut the granite for the then proposed new building to be erected in Washington for the use of the State, War, and Navy Departments. His bid for the work was put in on the nineteenth day of June, and formally accepted about the 1st of August. He resided at Richmond, Va., and late in July, 1871, negotiated with Robert G. Shedd, now deceased, for a loan, not exceeding $50,000, to be used in preparations for the execution of the contract. As security, Shedd was to be given, in some appropriate way, a lien on the contract, and he was to be repaid in instalments out of the profits. Under this arrangement, loans were made at various times during the summer and fall of that year, amounting, in the aggregate, to $38,500, from moneys which Shedd had in his hands as trustee for others.

By the terms of the bid of Ordway, as accepted by the supervising architect, Ordway was to furnish the granite from

either the James River or the Green and Westham quarries near Richmond, as the architect should direct. He was to be paid certain stipulated prices for the stone as measured before cutting, when delivered at the site of the building. ´ He was also to furnish the labor, tools, and materials necessary to cut, dress, and box the granite at the quarry in such manner as should be required, and also shops and sheds sufficient to accommodate one hundred granite-cutters, with a proper proportion of other mechanics. For this he was to be paid " the full cost of the . . . labor, tools, shops, sheds, and materials, and also the insurance on the granite, increased by fifteen per centum of the cost." At the time the bid was made and accepted, the erection of only that part of the building intended for the use of the State Department, being the south front, had been authorized, but Ordway was to furnish and cut, on the same terms and at the same prices, the granite for the whole building, as its construction should be provided for.

Ordway had control of the James River quarry, but not of the Green and Westham. The supervising architect required that the granite should be taken from the Green and Westham, which was owned by Andrews & Green. This made it necessary for Ordway to arrange, in some way, with Andrews & Green for the use of their quarry. The result was, that on the 7th of August these three persons entered into a copartnership under the name of Andrews, Ordway, & Green, and Andrews and Green put into the business their quarry, on certain specified terms, and Ordway all his contract with the government except that part which related to the cutting, boxing, &c., for the south front, which, as between himself and the firm, he retained for his own use. The profits accruing to the firm from the execution of the contract were to be divided in the proportion of fourteen thirty-sixths to Ordway and eleven thirty-sixths to each of the other partners. All other profits and losses were to be shared equally.

On the 16th of November, 1871, the contract between Ordway and the government was executed in form by Ordway and the supervising architect. On the 25th of November, Ordway entered into what was called an agreement of copartnership with one Andrew Washburne, " for the purpose of cutting,

dressing, and boxing the stone to be furnished the United
States under the contract of Ordway, dated Nov. 16, 1871, for
the new State Department," but which was in reality a transfer
of that part of the contract from Ordway to Washburne.  By the
terms of the arrangement Washburne was to furnish all the
capital, do all the work, and get all the pay.  The transfer,
however, was expressly confined to work for the State Depart-
ment proper; that is to say, the south front of the building.
This arrangement was assented to and recognized by the Sec-
retary of State on the 12th of December.

Work was begun under the contract of Ordway in January,
that being as soon as the necessary plans were furnished.  From
the beginning Washburne received the moneys realized from
the cutting and boxing part of the contract.  This yielded a
large profit, but the price paid for the granite in the rough was
less than the cost of quarrying and delivery, and entailed a loss
on Andrews, Ordway, & Green.  The supervising architect
required that the cutting should be done near the place of ship-
ment on the river.  This increased somewhat the expenses for
transportation, and deprived the firm of some incidental advan-
tages anticipated from having the work done at the quarry.
For this reason Washburne, in March, or about that time, gave
up to the firm six-fifteenths of the fifteen per cent paid him in
addition to the cost of cutting, &c., but retained the rest until
he afterwards, during the latter part of the spring or in the
summer, transferred all his remaining interest in the contract
to Andrews, one of the firm of Andrews, Ordway, & Green.
For this he was paid a consideration by Andrews individually.
The entire amount paid Washburne and Andrews on account
of the percentage on the cost of cutting for the south front was
about $94,000, and it nowhere appears that Ordway derived
any advantage from this part of his contract with the govern-
ment except indirectly through the six per cent given up to the
firm of Andrews, Ordway, & Green.  The cutting for the south
front was all finished in March, 1874, and the profits realized
and paid over.  The last payment on this account was made in
February or March of that year.

On the 29th of May, 1872, Ordway entered into a written
agreement with Shedd, by which, after reciting his contract

with the United States for furnishing and cutting the granite for the State, War, and Navy Department building, and that he was then "filling said contract as rapidly as he can under government supervision, said contract being filled and performed with others, and especially with the firm of Andrews, Ordway, & Green, of which he is a member," he conveyed to Shedd "three-eighths of the profits that accrue to the said Ordway, either individually or as a partner in the firm of Andrews, Ordway, & Green." He also in the same agreement declared it to be his intention thereby, "from the income and profits of said government contract, to amply, fully, and finally secure said Shedd, as said trustee, from any and all loss by reason of his said loan of $38,500." Full provision was made for an examination of accounts by Shedd and for payments by Ordway from time to time out of the profits as they accrued to him from the contract as it was fulfilled.

During the commercial crisis of 1873, the firm of Andrews, Ordway, & Green became financially embarrassed, and borrowed a large amount of money from J. Condit Smith. At his suggestion, the Westham Granite Company was incorporated, in March, 1874, and all the property of the firm, including the government contract, transferred to that company. Stock in the company was given to him for his debt, and to the firm for the estimated value of its property over what was owing him. The stock issued to the firm was held for the payment of outstanding debts, and then for distribution among the partners in proportion to their respective interests. The amount to which Ordway was entitled has never yet been ascertained. According to the evidence, that matter is still in the hands of a referee, mutually chosen by the parties, for adjustment.

On the 26th of July, 1874, Ordway was directed by the supervising architect to furnish and cut under his contract the granite required for the east wing of the building, an appropriation having been made by Congress for that purpose on the 23d of June previous. The Granite Company, as the successor of Andrews, Ordway, & Green, immediately entered on the performance of this work.

On the 4th of January, 1875, Shedd, then in life, not having been paid any thing by Ordway, commenced this suit for an

account of the profits that had already been realized by Ordway
from the contract, and for the appointment of a receiver to col-
lect such moneys as should thereafter belong to him, Shedd,
under his agreement.    Upon the filing of the bill, Ordway was
enjoined from making any further collections from the depart-
ment.    Various modifications of this injunction were made from
time to time, and on the 7th of July, 1875, Ordway was per-
mitted to collect all but three-eighths of the fifteen per cent on
the expenditures for labor, &c., under the cutting part of the
contract, and a receiver was appointed to collect and hold this
three-eighths to await the result of the suit.

After answer and replication, proof was taken which estab-
lished the foregoing facts.    On the 24th of November, 1875,
a decree was entered at a special term declaring the right of
Shedd to the moneys then in the hands of the receiver, and to
three-eighths of the fifteen per cent payable in the future prog-
ress of the work under the part of the contract which related
to the cutting, until his debt was fully paid.    The receiver was
continued for the purpose of making future collections as the
money from time to time fell due.    From this decree an appeal
was taken to the general term.    On the 18th of December,
1876, the death of Shedd was suggested on the record, and
Goddard, the appellant, his administrator, made complainant
in his stead.    On the same day a decree was entered affirming
that made at the special term.    Included in the same entry
was an order of the court allowing an appeal to this court
on the prayer of Ordway.    No bond was ever executed, and
nothing further was done under this allowance.    On the 22d
of December, and during the term, a notice was served on God-
dard by Ordway to the effect that he would "move that the
order affirming the decree . . . be set aside, and the case re-
argued, on the ground that a motion for reargument heretofore
made in open court had never been brought up in consultation,
or determined by the court, at the time of making said order of
affirmance, and that said order of affirmance ought not to have
been made in the premises, but was irregularly and inconsider-
ately pronounced and entered."    On the 30th of December an
entry was made on the minutes of the court, to the effect that
the appeal which had been allowed was withdrawn by Ordway.

On the same day the following entry appears on the journal of the court: —

" And now comes the defendant, and by his counsel, R. T. Merrick, moves the court to .vacate the judgment of affirmance heretofore made in the above-entitled cause, and for leave to argue the same before a full bench ; and assigns as reason therefor, in addition to reasons heretofore filed, that said cause was heard before only three of the justices, and that the judgment was rendered by only two of the justices, with whom the third did not concur."

After this entry was made, and before the motion was heard or disposed of, the court adjourned for the term. On the 6th of January, 1877, which was at the next term of the court, it was ordered that the cause be reargued and placed on the calendar of that term. Goddard afterwards moved to vacate this order, because at the time it was made the court had no jurisdiction of the suit or of the parties; and also because the rules of court were not complied with in respect to the form of the motion and the time of filing. On the 19th of February this motion was overruled, and on the 28th of March, the cause having been reargued, the decree of the special term was reversed, the bill dismissed, and an order made on the receiver to pay over the moneys in his hands, $24,931.72, to the defendant, Ordway, after deducting the receiver's commissions. From that decree Goddard, as administrator, appealed.

The first question presented for our consideration on the argument was as to the jurisdiction of the court below at its general term in March, 187.7, to set aside the order of affirmance made at the previous term, and give a new decree dismissing the bill, the motion to vacate the order and for leave to reargue the cause not having been filed until after the affirmance had actually been entered and after an appeal to this court allowed. The objections urged to the jurisdiction were: 1, that a court cannot reverse or annul its final decrees or judgments for errors of fact or law after the term at which they were rendered; 2, that the motion was not either in form or substance such as is required by equity rule 88 of that court for a petition for rehearing; and, 3, that the appeal to this court allowed by the court below on the. 18th of December, 1876,

took from that court the power to proceed further with the cause, or to entertain a motion to vacate the decree appealed from.

So far as the first objection is concerned, it is sufficient to say that the motion to vacate the order of affirmance and grant a reargument was made to and recognized by the court at the same term the order was entered, and before a final adjournment. This is evident from the fact that the motion was entered on the minutes of the doings of the court for the term. A paper may be filed in the proper office and yet not brought to the attention of the court while sitting in judgment, but when what it calls for appears on the minutes of actual proceedings, it must be presumed that the court, in some form, gave it judicial attention, and that it was presented in some regular way. In the Supreme Court of the District, as we are advised, if any matter in hand is not disposed of at one term, it is deemed to have been continued to the next. Whatever parties are bound to take notice of at one term they must follow to the next, if they are not, in some appropriate form, dismissed from further attendance. In this case the motion to allow a reargument went over as unfinished business, and carried the parties with it. The proceeding was in all material respects like a motion for a new trial filed in time at one term and not disposed of until the next. Under such circumstances, a judgment or decree, although entered in form, does not discharge the parties from their attendance in the cause. They must remain until all questions as to the finality of what has been done are settled. The motion, when entertained, prolongs the suit, and keeps the parties in court until it is passed upon and disposed of in the regular course of proceeding.

The second objection is, as we think, equally untenable. The motion, as made, was nothing more than an application to the court to vacate a decree which had been entered at a former day in the term, improvidently and without sufficient consideration. It was addressed entirely to the discretion of the court, and depended on facts within the knowledge of the justices. It was in no just sense a petition for rehearing, and even if it had been, we should not be inclined to reverse a decree because of what was, under the circumstances, an immaterial departure

from technical rules.   *Allis v. Insurance Company*, 97 U. S. 144.
The grounds of the application were sufficiently stated, and a
verification under oath might well have been omitted, since the
records of the court showed every thing that was claimed.   In
reality, the whole matter resolved itself into the simple question
of who should appeal to this court.   Ordway would have ap-
pealed if the original decree had stood, and Goddard has done
so since it was set aside.

The allowance of the appeal to Ordway was a judicial act of
the court in term time.   The order was entered on the minutes
as part of what was done in the cause by the court while in
session.   In *Ex parte Lange* (18 Wall. 163), we said that "the
general power of the court over its own judgments, orders, and
decrees, in both civil and criminal cases, during the existence
of the term at which they are first made, is undeniable."   *Bas-
sett v. United States*, 9 Wall. 38; *Doss v. Tyack*, 14 How. 297.
As part of the "roll of that term," they are deemed to be "in
the breast of the court during the whole term."   Bac. Abr., tit.
Amendment and Jeofail, A.   Under this rule, we think it clear
that the court had the power during the term, at the request of
Ordway, to set aside the order of allowance and thus vacate the
appeal which had been granted in his favor.   This was done
before any adverse rights had intervened.   We are unable to
see how the allowance of an appeal differs in this respect from
any other judicial order made in the cause.   If the one is sub-
ject to revocation or amendment while the term continues, so,
as it seems to us, must be the other.

There is nothing in this which interferes with the rule that
where an appeal is allowed all jurisdiction of the suit appealed
is transferred to this court.   Here the question is whether an
appeal was in legal effect allowed.   It is true an order of allow-
ance was granted and entered on the minutes of the court.   So
long as this order continued in operation, it bound the parties;
but as it remained subject to the judicial power of the court
during the term at which it was entered, its revocation vacated
what had been done, and left the decree standing with no appeal
allowed.   *Ex parte Roberts*, 15 Wall. 384.   Neither one of the
parties was finally discharged from the court until the term
ended, and each was bound to take notice of whatever was done

affecting his interests in the suit until a final adjournment actually took place.

Under these circumstances, we think the case is now here on its merits. The last decree at the general term was the final decree in the cause, and the appeal which has been taken from that decree opens the whole case for our consideration.

Upon the merits the decree below was right. Whatever may have been the original understanding with Shedd as to the security he was to have, it is clear that in the end he got only three-eighths of the profits that accrued to Ordway from his government contract, either individually or as a partner in the firm of Andrews, Ordway, & Green. All previous arrangements were merged in that finally reduced to writing. If the fund in court, therefore, does not in legal effect belong to Ordway, that is to say, does not represent his share of the profits growing out of the contract, it cannot be given to the representative of Shedd.

The testimony shows conclusively that down to the time the decree below was rendered, neither Andrews, Ordway, & Green, nor the Westham Granite Company, had realized any profits that were properly divisible to Ordway. Confessedly, the partnership had made nothing, and was largely in debt when the Granite Company was formed and took an assignment of the contract from the firm. If the company had in fact made any thing, the individual partners in the old firm had not, because the outstanding debts of the firm were to be paid before they could claim any distribution among themselves. The dividends on the stock held for the firm were liable to the payment of the debts before the partners individually were entitled to any thing.

All the profits on the cutting for the south front went to Washburne and his assignee, and never belonged to Ordway. Upon this question the evidence leaves no doubt. But whether that be so or not, nothing growing out of that part of the contract ever came into the hands of the receiver. That work was completed and the profits all received and paid over nearly a year before this suit was commenced.

As Ordway reserved from his transfer to Andrews, Ordway, & Green only that part of the contract for cutting which had

reference to the south front, it follows that the cutting for the east wing passed with the rest of the contract to the firm and its successor, the Granite Company.. The percentage payable on that part of the work all belonged to that company, and neither Ordway nor Shedd's representative could claim any part of it individually until it was due to Ordway as profits to be divided. The money collected by the receiver was three-eighths of this percentage. As the contract for the work stood in the name of Ordway at the department, he alone was recognized by the government when payments were made; but in making the collections he acted as the agent of the Granite Company, and was bound to pay over at once to the proper representative of the company every thing that came into his hands in this way. The receiver's title is no better than his would have been if the money had got into his hands. It follows that upon the case as it stands no decree can be rendered in favor of the present complainant for the money now in court.

Although Ordway is the only defendant in the suit, the controversy is about the fund in court. As he was the agent of the Granite Company authorized to make the collections from the government, he may defend the title of his principal. The suit is in effect the same as it would be if the money were now in his hands, and the representative of Shedd was seeking to prevent his paying it over to the company. In such a case it is clear he could show that he was but a trustee, and so, we think, he can in this. If, when our mandate goes down, the court below shall deem it necessary, in order to insure the payment of the money in the hands of the receiver to the Granite Company or its proper representative, that some special order be made in that behalf, that court is hereby authorized to take such action therein as shall seem to be necessary. It is clear from the evidence that the fund does not belong to Ordway, and that its payment to the Granite Company or its successors or assigns should in some form be secured.

*Decree affirmed.*