**Michelle FRANCIS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 96–CF–442.**

District of Columbia Court of Appeals.

Argued April 16, 1998.

Decided Aug. 6, 1998.

---

Richard Greenlee, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Megan E. Hills, Assistant United States Attorney, with whom Mary Lou Leary, United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., and June M. Jeffries, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and STEADMAN, Associate Judge, and BELSON, Senior Judge.

STEADMAN, Associate Judge:

In this appeal, we are required to address a trial court's power to modify a sentence in the course of a sentencing procedure that extended over a five-week period. The upward modification came about when the trial court discovered that appellant would likely receive presentence credit for time spent in a halfway house, thus frustrating the court's intent, expressed at the initial sentencing hearing, to have appellant actually serve two years' imprisonment. We hold that, under the facts of the present case, the trial court did not exceed its authority in sentencing appellant nor abridge her double jeopardy rights.[1]

## I.

After pleading guilty to murder in the second degree for the drowning of her three-year-old son, appellant Michelle Francis was sentenced on February 9, 1996, to a term of ten to thirty years, of which the entirety was suspended save for twenty-four months. The trial court, and apparently all parties as well, thought the twenty-four months would be spent in prison or a prison-like medical

---

1. Although the government in its brief suggests that this appeal is moot because appellant has already served her two-year term of incarceration and is now released on probation, the outcome of this appeal will still be determinative of the termination date of the five-year probation period.

facility. The prison term was to be followed by five years' probation. On defense counsel's motion, the trial court stayed execution of the sentence so that Francis could remain in the halfway house and would not be required to report to the custody of the executive branch until the question was settled as to the availability of space at what defense counsel termed the federal "correctional system treatment facility commonly referred to colloquially as CTF."[2] The court and defense counsel considered such a placement very important for the mental health treatment of Francis's bipolar disorder.[3] The court proceeded to set a "control date" of February 20, 1996 to monitor the situation as of that date.[4]

At a brief proceeding on February 20, continued to February 23, the trial court sua sponte raised the issue that in its sentencing decision it had failed to take account of the Department of Corrections' policy regarding presentence credit, and that depending on how the Department decided to consider Francis's presentence commitment to a halfway house, she might be eligible for immediate release on probation. This would defeat the court's stated intent for Francis to serve a sentence of two years' imprisonment. Given this new concern, the court continued the matter to March 14 to give the parties an opportunity to develop their positions.

At the next proceeding on March 14, the trial court heard argument from both the government and defense counsel. After satisfying itself that Francis would likely receive credit for her presentence time spent at the halfway house, the trial court said that, in order to "effectuate the Court's true intent," it had decided "at this point to impose a sentence" of ten to thirty years, followed by five years probation, with all of the incarceration suspended except for forty-five months. Thus, with the presentence credits, Francis would serve two years' time in prison before beginning probation.

Francis protested to the trial court, as she does to us, that the trial court acted beyond its authority. In response, the trial court recalled that "during the initial sentencing proceeding the Court clearing [sic] and unmistakably contemplated that she [Francis] would serve an additional two years beyond the time she has spent in the halfway house." Citing several of our cases,[5] the court concluded that its action was not inappropriate where done to "effect the Court's true intent." Given the overall posture of this particular case, we agree with the trial court's assessment and therefore affirm.

In doing so, we initially take special note of certain salient features of this case. The proceeding on February 9 did bear much of the general formality of an oral pronouncement of sentence,[6] and the unambiguous intention of the trial court and the apparent expectation of all concerned at that time was the imposition of a split sentence of two years' prison confinement and five years' probation. These facts are readily discernible from even a cursory inspection of the hearing transcripts. At the outset of the February 9 proceeding, the trial court inquired into whether "there [is] any factual historical matter that requires correction be-

2. Defense counsel sought the stay so that the treatments Francis was receiving at the halfway house would not be interrupted pending her arrival at the CTF.

3. In setting forth the conditions of imprisonment, the trial court stated that it "will strongly recommend federal designation with the hope and expectation that she will receive adequate mental care in the federal institution. The Court will preserve on the record the oral motion to modify sentence if federal designation does not appear to be a feasible option within 120 days from now."

4. No hearing would be required if appellant had by that date reported to CTF, which did not occur.

5. See Newton v. United States, 613 A.2d 332 (D.C. 1992); Gray v. United States, 585 A.2d 164 (D.C. 1991); Valentine v. United States, 394 A.2d 1374 (D.C.1978); Rich v. United States, 357 A.2d 421 (D.C.1976).

6. Were this not the case, there would be no issue on appeal, for if there had been no initial proceeding bearing some hallmarks of formal sentencing, Francis could not complain of any "resentencing." It is at least arguable, as the government urges before us, that, under a proper analysis of the proceedings here, no final sentence was imposed at all until March 14. Given our analysis of the applicable law, we need not decide this issue.

fore counsel proceeds with allocution and sentencing proceedings." The court then asked a series of questions which revealed its desire to arrive at a sentence that properly balanced Francis's need for mental health treatment and the government's interest in punishment and deterrence. The court inquired of Francis's defense counsel into his client's prospects for mental health recovery if forced to serve a split sentence of incarceration and probation:

> If [t]he Court were inclined to impose a strict sentence[,] is federal designation a reasonable option to ensure that your client receives the appropriate lithium treatment, and mental health treatment if she were required to serve some time in a prison as part of a split sentence[?]

The court added,

> Well, actually, this Court has pondered even a further question, and that is not simply warehousing, but if [t]he Court were to impose a split sentence where your client had to spend a year or two years or three years in prison, would she decompensate, would she then end up in St. Elizabeth's Hospital, and completely defeat the recovery or performance she has had over the last year and a half[?] I have wrestled with that question also.

Similarly, as a preface to its actual imposition of sentence the court remarked,

> This is certainly not an easy case to impose a sentence in, and [t]he Court has pondered ... [t]he appropriate approach to sentencing in this case, and while [t]he Court is sympathetic towards Ms. Francis and her circumstances[,] in sentencing in all cases [t]he Court must not only look at the defendant, but look at the victim of the case, and the rights and expectations of individuals in the community.

All participants at the February 9 hearing acknowledged that some period of incarceration, in some form, would be imposed. Francis's counsel himself argued for a period of confinement in a halfway house before allowing his client onto probation:

I think as [t]he Court knows from our letter, we are not suggesting or recommending to [t]he Court that [t]he Court place Ms. Francis on straight probation. That is not the sentence we are asking for. Indeed, the sentence we are asking for is a sentence that is a sentence, a split sentence, within that ... the government also agrees in terms of its recommendations.

He continued, "we are not suggesting merely straight probation. And what we are suggesting involves I think very significant restrictions on Ms. Francis's liberty for a very lengthy period of time. And, that does involve a punitive aspect."

After commenting on its consideration of multiple factors in arriving at a sentencing determination, the court proceeded as follows:

> And, having reflected on all of this [t]he Court has almost reluctantly and with kind of heavy heart reached the decision as follows in this case. Ms. Francis, you may stand at this point. The Court will sentence the defendant to a period of 10 to 30 years. Execution of sentence suspended except for two years. The Court will strongly recommend federal designation with the hope and expectation that she will receive adequate mental care in the federal institution. The Court will preserve on the record the oral motion to modify sentence if federal designation does not appear to be a feasible option within 120 days from now.

> Period of suspended sentence be followed by a period of five years probation with all of the conditions as recommended by the government [7]....

> The period of probation will be a full five year period probation, and [t]he Court will adopt the prosecution's standpoint of once she is on probation that periodic compliance hearings will be set. That will be the sentence of [t]he Court in this case.

Possibly reflecting its use of the future tense and the uncertainty as to placement, the court did not on that date sign a written judgment and commitment order.[8] The

**7.** At this point, the trial court dealt briefly with one exception involving the infant living child of appellant, who was conceived and born during appellant's stay at the halfway house.

**8.** The court said: "I think in light of the fact we

court ordered Francis to sign a notice showing her agreement to return to court for the February 20 "control" hearing if she had not yet reported to the federal treatment facility. The court closed the hearing with the following statement: "of course she has already received her sentence and she is then indicating to [t]he Court if you fail to appear [t]he Court will revoke its terms and require you to serve the full 10 to 30 years as well as what the specific facts are in this case."

■ It was not until after the imposition of the modified sentence on March 14 that the trial court signed a written judgment and commitment order. Since Francis had sought and obtained a stay of the execution of the February 9 sentence, she did not begin serving any sentence[9] until at least March 14.[10]

## II.

At common law, the sentencing court had plenary authority to increase a sentence at any point during the judicial term within which it had been imposed. *See United States v. DiFrancesco,* 449 U.S. 117, 133–34, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980); *United States v. Benz,* 282 U.S. 304, 306–07, 51 S.Ct. 113, 75 L.Ed. 354 (1931); *Goddard v. Ordway,* 101 U.S. 745, 752, 25 L.Ed. 1040 (1879); *Rowley v. Welch,* 72 App. D.C. 351, 353, 114 F.2d 499, 501 (1940); *Fine v. Commonwealth,* 312 Mass. 252, 44 N.E.2d 659, 662 (1942). The order imposing sentence was said to remain " 'in the breast of the court' " until the end of the session. *Benz, supra,* 282 U.S. at 306, 51 S.Ct. 113 (quoting *Goddard, supra,* 101 U.S. at 752, 25 L.Ed. 1040). Prior to the adoption by Maryland of a court rule of criminal practice narrowly limiting the trial court's power to modify sentences, the common law rule prevailed in that state, *see State ex rel. Czaplinski v. Warden, Maryland Penitentiary,* 196 Md. 654, 75 A.2d 766, 767 (1950); *State v. Butler,* 72 Md. 98, 18 A. 1105, 1106 (1890); *Seth v. Chamberlaine,* 41 Md. 186, 194 (1874);[11] and thus functions as the common law rule of the District, *see* D.C.Code § 49–301 (1997); *Linkins v. Protestant Episcopal Cathedral Found. of D.C.,* 87 U.S.App. D.C. 351, 354, 187 F.2d 357, 360 (1950) ("The common law, particularly as derived from the common law of Maryland, is the fundamental part of the law in this jurisdiction to which we look in the absence of statutory enactment.") (footnote omitted).

■ The breadth of this rule has been modified in the constitutional era, as the Double Jeopardy Clause has come to impose limits on sentence increases. For double jeopardy purposes, if the defendant has attained a legitimate expectation of finality, a valid sentence cannot be increased once the defendant has begun serving it.[12] *See Smith*

---

are not committing her today specifically and so forth, that the judgment and commitment order should be put on the form, in addition with an addendum to regular sentence form."

9. We construe commencement of service to describe the point of "transfer of a convicted individual from the judiciary, which pronounced sentence, to the executive, which administers it." *Thomas v. United States,* 388 A.2d 1231, 1232 (D.C.1978). Although appellant claims that she starting serving the sentence when she returned to the halfway house on February 9, it is clear that, at her request and over the government's opposition, the sentence was stayed without any "step-back" so as simply to preserve the status quo ante.

10. The record is silent as to exactly when Francis commenced service of the sentence; however, she concedes that it was at some point after the March 14 resentencing. At that proceeding, the trial court remarked that "in this case the Defendant has not even stepped back to begin sentencing yet...."

11. The Court of Appeals of Maryland observed, "It is well established and has been the law in this state, from the earliest days, that a court retains power over its own judgments and orders in both civil and criminal cases during the term at which they are entered or made." *Czaplinski, supra,* 75 A.2d at 767 (emphasis omitted). In *Butler,* the court cited a leading treatise for the proposition that " '[t]he power to vacate judgments was conceded by the common law to all its courts. This power was exercised in a great variety of circumstances, and subject to various restraints.... One rule is, however, undoubted. It is that the power of a court over its judgments, during the entire term at which they are rendered, is unlimited.' " 18 A. at 1106 (quoting A.C. FREEMAN, A TREATISE ON THE LAW OF JUDGMENTS § 90, at 79 (3d ed. 1881)).

12. The precise contours of the double jeopardy limitation on resentencing can be difficult to define, as illustrated by two cases. In *DiFrancesco,* the Supreme Court expressly declined to address whether the Double Jeopardy Clause actu-

*v. United States,* 687 A.2d 581, 583 (D.C. 1996); *Green v. United States,* 363 A.2d 979, 980–81 (D.C.1976); *United States v. Fogel,* 264 U.S.App. D.C. 292, 302, 829 F.2d 77, 87 (1987); *Tatum v. United States,* 114 U.S.App. D.C. 49, 50, 310 F.2d 854, 855 (1962). However, the Supreme Court has made clear that this restriction on the augmentation of a sentence is not jurisdictional, but purely constitutional in character:

> The distinction that the court during the same term may amend a sentence so as to mitigate the punishment, but not so as to increase it, is not based upon the ground that the court has lost control of the judgment in the latter case, but upon the ground that to increase the penalty is to subject the defendant to double punishment for the same offense in violation of the Fifth Amendment to the Constitution. . . .

*Benz, supra,* 282 U.S. at 307, 51 S.Ct. 113.[13]

## A.

■ The trial court's resentencing decision did not implicate Francis's double jeopardy rights, as she secured a stay of execution of the sentence and therefore had not begun serving it at the time of resentencing. *See Green, supra,* 363 A.2d at 981 ("The relevant touchstone in determining whether appellant has commenced serving his sentence is

whether he was delivered to executive custody for that purpose."). *Cf.* 18 U.S.C. § 3585(a) (1994) ("A sentence to a term of imprisonment commences on the date the defendant is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served."). Moreover, even under our decision in *Thomas, supra* note 9, the resentencing occurred within a reasonably prompt time frame in that the trial court broached the subject eleven calendar days after the original sentence was pronounced. *See* note 12, *supra.* Unlike the scenario spun in *Thomas* of a "convicted individual" being "held indefinitely in the cell block, subject to imposition of a more severe sentence," 388 A.2d at 1233, here Francis, upon request of her counsel and over the government's objection, returned to a halfway house to await her arrival at the federal treatment center. Furthermore, from February 9 onward her only legitimate expectation was to serve two years' time in that facility. The trial court's March 14 decision only effectuated that expectation, conforming her sentence to the court's clearly expressed intent. Other general concerns expressed in *Thomas* associated with resentencing, absent in that case, are equally absent here:

> We are not here presented with a situation in which transfer of custody was delayed to

ally precludes resentencing after service of the sentence has begun: "the established practice in the federal courts [is] that the sentencing judge may recall the defendant and increase his sentence, at least (and we venture no comment as to this limitation) so long as he has not begun to serve that sentence." 449 U.S. at 134, 101 S.Ct. 426. The Court hinted, evidenced by its criticism of *United States v. Benz* and the decision to restrict the reach of *Benz* to its particular facts, *see* note 13, *infra,* that the Double Jeopardy Clause may not in fact preclude an increase in sentence, after service has begun, in all circumstances.

On the other hand, in *Thomas v. United States, supra* note 9, 388 A.2d at 1232, we suggested that the double jeopardy constraint on increasing a pronounced sentence may be triggered earlier than the point at which the defendant commences service of his sentence:

> In a technical sense, the Double Jeopardy Clause is inapplicable absent a transfer of a convicted individual from the judiciary, which pronounced sentence, to the executive, which

administers it. Both *Rowley* and *Green* make clear, however, that the Double Jeopardy Clause is violated, even absent such a transfer of custody, when resentencing does not occur in a reasonably prompt manner.

(Citations omitted.)

The ambiguity in the law, highlighted by these cases, does not affect our resolution of Francis's double jeopardy challenge, as the resentencing here took place before Francis commenced service of her sentence and, in any event, was reasonably prompt under the circumstances. *See* Part II.A., *infra.*

**13.** The portion of this quoted language imposing a broad double jeopardy limitation on sentence increases after service of the sentence has begun was later questioned by the Supreme Court in *DiFrancesco, supra,* 449 U.S. at 138–39, 101 S.Ct. 426. We do not read *DiFrancesco,* however, to affect the portion of the quoted language relevant here, namely, that any constraint on the trial court's capacity to increase a sentence (during a particular common law judicial term) is constitutional, not jurisdictional.

facilitate imposition of a more severe sentence, or in which such delay was occasioned by neglect or indifference. Nor do we have in this case a trial court changing its mind with respect to the first sentence imposed. Rather, we review correction of a sentence never intended.

*See* 388 A.2d at 1233.

Accordingly, the only issue before us is whether the trial court retained jurisdiction on March 14 in order to accomplish the resentencing.

**B.**

Apart from her double jeopardy argument, Francis urges that we depart from the common law rule authorizing resentencing during the same judicial term. She argues that with the adoption of the Superior Court Criminal Rules the jurisdiction of the trial court to modify a sentence has been dramatically limited. Citing mainly federal cases, Francis claims that the trial court must look to specific statutory sources of authority to justify a decision to resentence and that there is no longer any "inherent power" to do so.

Indeed, the rule currently prevailing in many federal circuits, to the extent one may be distilled, seems to be that the district court possesses no inherent authority to modify a sentence; it may do so "only in specified instances where Congress has expressly granted the court jurisdiction...." *United States v. Blackwell*, 81 F.3d 945, 947 (10th Cir.1996); *see also, e.g., United States v. Caterino*, 29 F.3d 1390, 1394 (9th Cir. 1994); *United States v. Fahm*, 13 F.3d 447, 453–54 (1st Cir.1994); *United States v. Daddino*, 5 F.3d 262, 265 (7th Cir.1993).[14] However, this limitation would be unique to the federal system, as "[f]ederal courts are courts of limited jurisdiction. Congress has authorized the federal courts to modify a sentence only in limited circumstances."[15] *Blackwell, supra,* 81 F.3d at 946 (citation omitted); *see also Aldinger v. Howard,* 427 U.S. 1, 15, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976) (a "well established principle [is] that federal courts, as opposed to state trial courts of general jurisdiction, are courts of limited jurisdiction marked out by Congress."); *see generally* Lee R. Russ, Annotation, *Power of State Court, During Same Term, To Increase Severity of Lawful Sentence—Modern Status,* 26 A.L.R.4th 905 (1983). The congressional authorization referred to in *Blackwell,* which also appears to serve as an express limitation on federal court power, is contained in 18 U.S.C. § 3582(c) (1994): "the court may not modify a term of imprisonment once it has been imposed" except as provided in that subsection.[16] It then sets forth "three avenues

**14.** Appellant especially cites us to *United States v. Addonizio,* 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979). That case involved the power of a trial court to reduce a sentence to effectuate the original sentencing intent in the context of a collateral attack under 28 U.S.C. § 2255 (1994) long after the 120 days allowed under Federal Rule of Criminal Procedure 35, *see infra.* The Court held that the time period in Rule 35 was "jurisdictional and may not be extended." 442 U.S. at 189, 99 S.Ct. 2235. But the present case involves a trial court increase of a sentence imposed far before the expiration of any such time limit, which, in any event, would be undoubtedly earlier determined by the constitutional limitations already discussed. The question before us is one of inherent power of the Superior Court, and, indeed, *Addonizio* itself mentions "the beginning of the service of the sentence" as the time when federal trial court power to change a sentence ended prior to Federal Rule 35, whose adoption was thus an extension of authority beyond that point. *Id.* at 190 n. 16, 99 S.Ct. 2235 (internal quotation marks omitted).

**15.** This assertion does seem to stand in some contrast to earlier federal decisions holding that a case remained in the "breast of the court" until the end of the judicial term, *see, e.g., Goddard, supra,* 101 U.S. at 752, 25 L.Ed. 1040, or at least until the beginning of the service of sentence, *see Addonizio, supra* note 14, 442 U.S. at 190 n. 16, 99 S.Ct. 2235. We need not reconcile this apparent contradiction here; it may be simply a consequence of the enactment of the provision discussed in the text.

**16.** Section 3582(c) was enacted as part of the Sentencing Reform Act of 1984. The subsection does contain a general provision that "the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure." Several federal circuit courts have held that this section does not preclude the application of Federal Rule 36, which allows correction of clerical errors at any time. *See, e.g., Blackwell, supra,* 81 F.3d at 948 n. 3; *United States v. Lopez,* 26 F.3d 512, 515 n. 5 (5th Cir. 1994).

through which the court may 'modify a term of imprisonment once it has been imposed.' " *Blackwell, supra,* 81 F.3d at 947 (quoting § 3582(c)). The avenue applicable to a federal case comparable to the one before us would be Federal Rules of Criminal Procedure 35 and, perhaps, 36, whose District of Columbia counterparts, Superior Court Criminal Rules 35 [17] and 36,[18] do not speak to the question of whether the trial court may increase a valid sentence for other than clerical errors.[19]

It thus appears that the limitation on re-sentencing authority operative in the federal system flows from a federal statute inapplicable in the District of Columbia court system. There is no comparable statute in the D.C.Code. Furthermore, the Superior Court, unlike the federal district courts, is a court of general jurisdiction invested with the full panoply of inherent powers possessed by common law courts. *See* D.C.Code § 11–923 (1995); District of Columbia Self–Government and Governmental Reorganization Act, Pub.L. No. 93–198, § 431(a), 87 Stat. 774, 792–93 (1973) ("The judicial power of the District is vested in the District of Columbia Court of Appeals and the Superior Court of the District of Columbia. The Superior Court has jurisdiction of ... any criminal case under any law applicable exclusively to the District."); *Multi–Family Management, Inc. v. Hancock,* 664 A.2d 1210, 1227 (D.C. 1995) (Farrell, J., concurring) (Superior Court is court of general jurisdiction); *King v. Kidd,* 640 A.2d 656, 661 (D.C.1993) (Superior Court has general jurisdiction over common law claims for relief); *Farmer v. Farmer,* 526 A.2d 1365, 1369 (D.C.1987); *Jackson v. United States,* 441 A.2d 1000, 1002 (D.C. 1982) (Superior Court is endowed with " 'powers similar to those of state courts' ") (quoting *Thompson v. United States,* 179 U.S.App. D.C. 76, 79, 548 F.2d 1031, 1034 (1976)); *Andrade v. Jackson,* 401 A.2d 990, 992 (D.C.1979). Absent contrary statutory provisions or court rules, and subject of course to constitutional restraints, we apply the established common law rules in this jurisdiction, as expounded by our more recent case law, governing when the trial court is empowered to modify a sentence.[20]

---

**17.** Rule 35 provides in pertinent part:

(a) *Correction of sentence.* The Court may correct an illegal sentence at any time and may correct a sentence imposed in an illegal manner within the time provided herein for the reduction of sentence.

(b) *Reduction of Sentence.* A motion to reduce a sentence may be made not later than 120 days after the sentence is imposed or probation is revoked, or not later than 120 days after receipt by the Court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or not later than 120 days after entry of any order or judgment of the Supreme Court denying review of, or having the effect of upholding, a judgment of conviction or probation revocation. The Court shall determine the motion within a reasonable time. After notice to the parties and an opportunity to be heard, the Court may reduce a sentence without motion, not later than 120 days after the sentence is imposed or probation is revoked, or not later than 120 days after receipt by the Court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or not later than 120 days after entry of any order or judgment of the Supreme Court, denying review of, or having the effect of upholding, a judgment of conviction or probation revocation....

**18.** Rule 36 provides as follows:

Clerical mistakes and errors in judgments, orders, or other parts of the record not including the transcript which arise from oversight or omission may be corrected by the Court at any time and after such notice, if any, as the Court orders. No changes in any transcript may be made by the Court except on notice to the prosecutor and counsel for the defendant. Where changes are made in the transcription of proceedings, the corrections and deletions shall be shown.

**19.** Unlike Superior Court Criminal Rule 35, its federal counterpart allows that "[t]he court, acting within 7 days after the imposition of sentence, may correct a sentence that was imposed as a result of arithmetical, technical, or other clear error." *See* Fed.R.Crim.P. 35(c). The purpose of this provision, added to the federal criminal rules in 1991, was to codify the result in such cases as *United States v. Cook,* 890 F.2d 672 (4th Cir.1989), and *United States v. Rico,* 902 F.2d 1065 (2nd Cir.1990), which held that the trial court has "the inherent authority ... to correct a sentence within the time allowed for sentence appeal by any party under 18 U.S.C. 3742," while imposing "a more stringent time requirement." Fed.R.Crim.P. 35 note (1991 Amendment).

**20.** Superior Court Criminal Rule 35 does not address increases of valid sentences and should not be read to preempt or foreclose all judicial

## C.

We read our cases generally as recognizing that the trial court possesses an inherent power, restricted only by constitutional considerations, to modify a sentence upward at any time before it has begun to be served, at least where it is clear that there has been a mistake or oversight and that the second sentence is imposed to conform to the clear intent expressed at the original sentencing proceeding.

Many of the early D.C. cases dealing with resentencing asserted broadly that "a sentence in all respects legal cannot be increased after service has begun." *Borum v. United States*, 133 U.S.App. D.C. 147, 154, 409 F.2d 433, 440 (1967) (citing, e.g., *Ex Parte Lange*, 18 Wall. 163, 85 U.S. 163, 21 L.Ed. 872 (1873), and *King v. United States*, 69 App. D.C. 10, 13–15, 98 F.2d 291, 294–96 (1938)); *see also United States v. Robinson*, 388 A.2d 469, 471 (D.C.1978); *Green, supra*, 363 A.2d at 980–81; *United States v. Evans*, 148 U.S.App. D.C. 110, 112, 459 F.2d 1134, 1136 (1972). Impliedly, then, an increase in sentence accomplished prior to service is permissible, at least in some circumstances:

> The oral utterance [of sentence] is an act of judgment, but it is not an entirely unalterable one. Other events, as for example entry of the order of commitment, are required to give it absolute finality. Until they occur, the court retains jurisdiction and power, within recognized limits which need not be specified here, to make corrections, perhaps even other changes, which may be required by a right administration of justice. Entirely apart from specific constitutional limitations, therefore, there is nothing in the nature of mere oral pronouncement of sentence, judgmental in character though that act may be, which gives it absolutely unalterable quality.

*Rowley, supra*, 72 App.D.C. at 355, 114 F.2d at 503.

In *Rich, supra* note 5, we upheld a sentence modification where the trial judge, intending to incarcerate the defendant, had inadvertently cited a statutory authority that permitted immediate release.[21] Apart from Superior Court Criminal Rule 36, which allows for the correction of clerical errors, we recognized that "the court's actions were justified based on its inherent power to correct its record so as to reflect the truth and insure that justice be served." 357 A.2d at 423.

Shortly after deciding *Rich*, we revisited the issue of resentencing in *Green, supra*, 363 A.2d 979. In that case, within an hour after sentencing the defendant to a prison term of three to six years, the trial court, discovering that it had misspoken, recalled the defendant and increased the outer limit of the sentence to nine years. We rejected the defendant's double jeopardy challenge to the resentencing, holding that he had not yet been transferred to executive custody and that "[t]he trial court is not precluded from correcting an inadvertent pronouncement, even by increasing the sentence[,] providing the change is made promptly." *Id.* at 981–82.

More recently, in *Gray, supra* note 5, we addressed whether a trial judge, having mistakenly sentenced a defendant orally to five to fifteen *months* incarceration, could later change the sentence to five to fifteen *years* in the written Judgment and Commitment Order. Aside from the fact that the oral sentence was illegal in that it undercut the statutory minimum sentence, and thus correctable at any time under Superior Court Criminal Rule 35, we ruled that the trial judge had the "inherent power" to correct the sentence because it clearly did not conform to his intent. Our decision emphasized the fact that, although the "oral pronouncement of sentence constitutes the judgment of the court, and

---

action in that regard. The rule does deal in some detail with sentence reductions, a focus that has been explained as an effort to standardize the procedure of motions by defendants to reduce sentence. *See United States v. Nunzio*, 430 A.2d 1372, 1376 (D.C.1981) (Mack, J., dissenting). As to sentence reductions, the time limitation of Rule 35 is mandatory, *see id.* at 1374 (applying *Addonizio, supra* note 14), and in

that regard circumscribes whatever power the trial court might have had at common law. The precise wording of Rule 35 was amended subsequent to *Nunzio*.

21. The judge made the sua sponte correction on the same day the initial sentence was imposed.

will prevail over an inconsistent written commitment," this rule "applies only where the former is clear and unambiguous." 585 A.2d at 166. We stated,

> Although a sentence of five to fifteen months for an offense with a five year mandatory minimum is superficially unambiguous, its apparent clarity is deceptive. The court is not required to blind its eyes to clear evidence of its own intention. Sentencing is not a game. . . .
>
> Obviously, as the judge subsequently revealed, he did not intend to impose an illegal sentence. . . . The possibility—indeed, the virtual certainty—that the illegal sentence resulted from a slip of the tongue was readily apparent. The sentence from the bench was, therefore, at least ambiguous, for any reasonable person would have concluded that the judge did not mean to say what he said.

*Id.* (citations and internal quotation marks omitted).

Finally, in *Newton, supra* note 5, 613 A.2d at 334, albeit not a sentencing case, we addressed the power of the trial court "to vacate a procedurally incorrect order entered by mistake or inadvertence." In affirming the trial judge's decision to vacate a prior order granting a new trial, which was based on the judge's erroneous reading of a statute, we relied on the "inherent power" rationale of *Rich* and the notion that a defendant should not profit, absent a prejudicial constitutional violation, " 'by a wrong move by the judge.' " *Id.* at 335 (quoting *Lindsay v. United States,* 520 A.2d 1059, 1064 (D.C. 1987)). Significantly, we interpreted *Rich* to involve not the mere correction of a clerical error, but rather a statutory misconstruction by the sentencing judge. *But see id.* at 337–38 (Rogers, C.J., concurring in the result). The basis for our decision in *Newton* was the holding in *Rich* that the trial court possesses an "inherent power" to correct such mistakes "in the interests of justice." *Id.* at 334 n. 6.

Francis places great reliance on our decision in *Smith v. United States, supra,* 687 A.2d 581. In that case, the trial court first granted the defendant's motion to reduce his sentence on the ground that it was unopposed by the government. Two days later,

the court granted the government's motion for reconsideration and vacated the reduction order. We reversed exclusively on double jeopardy grounds, agreeing with the appellant that, under the circumstances, because the trial court "had entered a valid—not legally flawed—order reducing his [the defendant's] sentence, the court's eventual reinstatement of the original sentence amounted to an increased sentence, contrary to his right to expect finality of the reduced sentence." *Id.* at 585. We rejected the government's argument that the court possessed inherent power to reinstate the sentence, the rule of *Newton,* because *Newton* articulated the rule in a setting that "involved no issue of double jeopardy." *Id.* We also compared the action in *Newton* to a correction of an illegal action—in that the original order was entered "in a manner that departed from the [applicable] statute"—such that *Newton* "could have acquired no legitimate expectation of finality." *Id.* at 586.

■ *Smith* focused on the defendant's legitimate expectation of finality in the order granting his sentence reduction—presumably while he was already serving the sentence at issue—as a way to assure compliance with the Double Jeopardy Clause. For the reasons already discussed, because Francis had obtained a temporary stay of the execution of her sentence, she can claim no double jeopardy violation, much less, given the circumstances of the sentencing proceeding, fairly claim a violation of a legitimate expectation of finality.

### D.

Although it may be sometimes difficult to classify our resentencing cases according to whether they were resolved on double jeopardy grounds or on an analysis of the trial court's authority to act, we are satisfied that in the circumstances here, the trial court had authority to impose its March 14 sentencing. To be sure, the February 9 sentence may not have been in its literal text "superficially ambiguous," *see Gray, supra* note 5, 585 A.2d at 166, nor did it contain a purely clerical error. However, the court's unmistakable intent in sentencing was to confine Francis

for a period of two years in a correctional facility. The court, along with the parties, overlooked the possibility that credit would be given for Francis's tenure at the halfway house. Reading *Rich, Green, Gray,* and *Newton* collectively, we are persuaded that this error was redressable by the trial court before Francis began service of her sentence. *Gray* is particularly on point in that here, as there, "the sentence from the bench was ... at least ambiguous, for any reasonable person would have concluded that the judge did not mean" for Francis to be released immediately on probation. *See id.* In addition, further proceedings relating to sentencing were plainly contemplated as a possibility. Execution of the sentence was stayed at the express wish of Francis. No written judgment or order was rendered until March 14, before actual service of the sentence had begun.[22] Given these and all the other circumstances of the case before us, the order of resentencing appealed from is

*Affirmed.*

---

22. We have said that the rule "[g]iving primacy to the oral sentence over a subsequent written one is designed to *prevent a vindictive judge* from changing his mind in a manner adverse to the defendant." *Gray, supra* note 5, 585 A.2d at 166. The trial court here was not motivated by vindictiveness, nor did the March 14 sentencing result from a change of judicial mind. Quite the contrary.